# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1263

_____

| | | |
|---|---|---|
| Branimir Catipovic, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the Northern |
| Peoples Community Health Clinic, | * | District of Iowa. |
| Inc.; Ronald W. Kemp; Sharon Duclos, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| Iowa Beef Processors, Inc., | * | |
| | * | |
| Defendant - Appellee, | * | |
| | * | |
| Rex Hofer; Thomas O'Rourke; Ann | * | |
| Rogers; Black Hawk County Health | * | |
| Department, | * | |
| | * | |
| Defendants. | * | |

_____

Submitted: October 21, 2004
Filed: March 30, 2005

_____

Before MORRIS SHEPPARD ARNOLD, JOHN R. GIBSON, and SMITH, Circuit
Judges.

_____

SMITH, Circuit Judge.

Dr. Branimir Catipovic appeals from an order entered in the district court[1] granting Iowa Beef Processors, Inc. (IBP), judgment as a matter of law in his tortious interference with contract action against it. For reversal, Catipovic argues that the district court erred in granting judgment as a matter of law. We disagree and affirm.

## I. *Background*

In October 1997, Dr. Catipovic, a Croatian national, began working as a physician for the Peoples Community Health Clinic (the Clinic) in Waterloo, Iowa. Catipovic alleges that IBP[2], one of the Clinic's largest customers, purposely caused his termination through its coercive influence upon the Clinic's management. Catipovic contends that IBP disliked his medical treatment of injured workers.

Upon his hiring, Catipovic signed a contract with the Clinic called the Physician Employment Agreement (the Agreement). The Agreement authorized the Clinic to terminate Catipovic involuntarily for specified causes and also included a provision for voluntary termination by either party with 120 days notice. By written addendum, if Catipovic selected early termination he was required to pay $250,000 in liquidated damages plus attorney fees. The Clinic also had an employee handbook that defined voluntary and involuntary separation as well as at-will termination. The employment contract further required an annual evaluation of Catipovic.

Director Ron Kemp managed the business affairs of the Clinic, which served the low-income population in the Waterloo area. Kemp, who was not a physician, could not supervise physicians. That responsibility went to co-medical directors, Dr. Sharon Duclos and Dr. Kimberly Neumann, who reported administrative issues to Kemp. Duclos directly supervised Catipovic. Duclos claimed she evaluated

[1]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa.

[2]IBP, a meat packing plant, is Waterloo's second largest employer.

Catipovic, but she found no records verifying this review. Catipovic did not recall any performance review, although he admitted Duclos did discuss his performance once during his first year.

During the two years of his employment, Catipovic and the Clinic management clashed regarding standards employed when ordering medical work-releases for IBP employees.[3] While at the Clinic, Catipovic wrote hundreds of work-releases for IBP employees. Some listed specific work restrictions, while others only stated "can't work." Work-releases are a significant cost concern for IBP.[4] In late fall 1997 or early 1998, Lori Seals, the IBP medical case manager, brought the number of releases written by Catipovic to the attention of IBP human resources manager, Rex Hofer. Hofer, in turn, discussed the matter with senior plant management.[5]

Based upon these discussions, Hofer requested a meeting with the Clinic to discuss the work-release issue. This meeting was held on February 23, 1998 and included Seals, Hofer, Catipovic, Duclos, and Kemp. At the meeting, workers' compensation procedures and IBP's policies were discussed. IBP requested that the

---

[3]Out of approximately 2000 workers, 700 to 800 were Bosnians. IBP readily recruited these workers because of their stability and work ethic. Because of his familiarity with their language and culture, Catipovic communicated well with these patients and served as the primary care physician for many.

[4]Labor is IBP's largest controllable cost. It uses a safety measurement score point system to track workers' compensation injuries. Each plant is assigned a point goal by corporate headquarters. Points are incurred when an employee visits a physician for a work-related injury.

[5]IBP management held regular meetings to discuss the plant score and how to keep it low. IBP is self-insured for workers' compensation and for medical insurance, which does not cover work-related conditions. Injured workers were placed on light duty when possible because they were fully compensated. Workers totally unable to work received two-thirds salary compensation.

work-releases be more specific to determine whether they were job related. Seals recollected that the meeting went well.

Also early in 1998, Catipovic discussed an IBP patient situation with Joan Hoeft, director of special projects at the Clinic. Catipovic expressed concern that a patient he had placed on work limitations was returned to work at a light duty level in an undesirable plant position. Catipovic believed IBP used the assignment as a punitive measure. Hoeft offered to call IBP because she thought Catipovic would be too offensive if permitted to contact IBP directly. Hoeft called Hofer at IBP who in turn called Kemp.

Kemp and Hofer discussed the impact of the work-releases on IBP employees. Catipovic was told that the union representative reported IBP employee concerns about salary loss due to medical work-releases. For the Clinic, Duclos again told Catipovic to be as specific as possible and write work limitations in preference to complete work-releases.

About eight months later, in October 1998, Hofer again contacted Kemp about two of Catipovic's work-releases that stated simply "can't work." Kemp noted Hofer wanted employees with possible work injuries to be sent back to IBP for a second evaluation. Neumann was also aware of IBP's concern with Catipovic's work-releases. Hofer denied any further contact with Kemp or the Clinic to discuss work-releases, but testified that IBP's nursing staff called the Clinic personnel to discuss day-to-day situations. Catipovic also produced evidence that on May 18, 1998, Schmitz, IBP plant manager, endorsed Kemp's request that IBP Foundation contribute to the Clinic. IBP agreed to give $10,000 per year for 10 years. The first installment was made in July 1998. Catipovic was terminated in September 1999.

According to the Clinic, it terminated Catipovic because of problems with his treatment of tuberculosis (TB) patients and because of patient complaints due to his

rudeness, demeanor, and foul language. In November 1997, Black Hawk County Health Department director Tom O'Rourke told Kemp he did not believe Catipovic was following Center for Disease Control (CDC) guidelines for the prophylactic treatment of persons testing positive for TB. Ten of Catipovic's Bosnian patients were reviewed and his prophylactic treatment for eight of them was deemed insufficient. The County Health Department also expressed concern about Catipovic's failure to return documentation.

In September 1999, the issue resurfaced. The County Health Department formally requested that the Clinic not permit Catipovic to see any more patients with TB related problems unless the chart was co-signed by the Clinic's medical director, that there be a complete chart review of all TB patients referred to Catipovic, and Catipovic be referred to the appropriate licensing and oversight board(s) for their review. O'Rourke felt it necessary to bring the Clinic practice into conformity with CDC standards. O'Rourke also contemplated making formal complaints to the State Health Department, Board of Examiners, and relevant federal entities.

On September 21, 1999, the Clinic's board of directors' executive and personnel committees approved a recommendation to terminate Catipovic's employment. On September 27, 1999, pursuant to the voluntary termination provisions, Catipovic's contract was terminated under Article IX, effective January 25, 2000. Catipovic questioned the termination, but the Clinic refused to specify a reason. Catipovic filed a complaint with the Iowa Civil Rights Commission. The Clinic responded, identifying two problem areas–Catipovic's treatment of TB patients, and interpersonal relationships with patients, staff, and community organizations. The Clinic further indicated there had been complaints from patients regarding Catipovic's perceived rude, inconsiderate, unconcerned, and hostile response to patients. The Clinic made no mention of IBP.

Catipovic sued IBP for tortious interference with contract. At trial, the district court denied IBP's motion for summary judgment, but at the close of Catipovic's case IBP's motion for judgment as a matter of law was granted. Catipovic appeals from this judgment.

## II. *Discussion*

We review the district court's judgment de novo. *Bergstrom-EK v. Best Oil Co.*, 153 F.3d 851, 857 (8th Cir. 1998). Whether judgment as a matter of law is appropriate "is judged by viewing the evidence in the light most favorable to the nonmoving party and giving him or her the benefit of all reasonable inferences from the evidence, but without assessing credibility." *Harvey v. Wal-Mart Stores, Inc.*, 33 F.3d 969, 970 (8th Cir. 1994). On appeal, we must: "(1) consider the evidence in the light most favorable to [Catipovic]; (2) assume that all conflicts were resolved in favor of [Catipovic]; (3) assume as proved all facts that [Catipovic's] evidence tended to prove; (4) give [Catipovic] the benefit of all favorable inferences that may reasonably be drawn from the proved facts, and [reverse and remand to the district court] unless all the evidence points one way and is susceptible of no reasonable inferences sustaining [Catipovic's] position." *Denesha v. Farmers Ins. Exchange*, 161 F.3d 491, 497 (8th Cir.), *cert. denied*, 526 U.S. 1115 (1999).[6]

---

[6]IBP wrongly argues that in *Dace v. ACF Industries, Inc.*, 722 F.2d 374, 376 n.4 (8th Cir. 1983), we indicated in cases involving diversity jurisdiction, the state law standard for directed verdict, permitting use of unfavorable evidence, is employed. But that is not what we held. In note 4 we stated:

> We are aware of two cases in which this Court endorsed a standard for directed verdicts that allowed consideration of unfavorable evidence. *State Farm Mut. Auto. Ins. Co. v. Borg*, 396 F.2d 740, 742 (8th Cir. 1968); *Hanson v. Ford Motor Co.*, 278 F.2d [586, 590 (8th Cir. 1960)]. However, both cases involved diversity jurisdiction, and the Court applied the Minnesota standard for directed verdicts, not the federal standard.

A. *Judgment As a Matter of Law*

Under Iowa law,[7] a claim for tortious interference with contract includes five elements. Applied to this case, Catipovic could prevail on his claim if the evidence showed: (1) he had a contract with the Clinic; (2) IBP knew of the contract; (3) IBP intentionally and improperly interfered with the contract; (4) IBP's interference caused either the Clinic or Catipovic not to perform the contract; and (5) he incurred damage. *See Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 399 (Iowa 2001); *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 763 (Iowa 1999); *Nesler v. Fisher and Co. Inc.*, 452 N.W.2d 191, 198 (Iowa 1990); Iowa Civil Jury Instructions 1200.1 (2002). The absence of any single element ends the inquiry.

In granting IBP's motion for judgment as a matter of law, the district court found Catipovic had been fully heard and that "there is no legally sufficient evidentiary basis for a reasonable jury to find for [Catipovic]." The court specifically found his proof failed to establish element three–intentional interference, but also noted it found his evidence suspect as to elements two and four as well. In its brief, IBP correctly notes that we may affirm the district court on any grounds supported in the record. *Ozark Heartland Elecs., Inc. v. Radio Shack*, 278 F.3d 759, 763 (8th Cir. 2002). IBP urges us to hold that Catipovic failed to establish elements two and four. Upon review, we find merit in IBP's argument and affirm the district court based upon insufficiency of proof as to element four–causation.

Granting Catipovic all reasonable inferences, as we must do, we will assume his evidence was sufficient to enable a reasonable jury to find in his favor as to elements one, two, and three. However, his proof as to causation is so lacking that a

---

[7]Catipovic's originally filed a complaint in the United States District Court alleging breach of several federal statutes. The district court entertained Catipovic's tortious interference claim against IBP, essentially a state action, under 28 U.S.C. § 1367 (supplemental jurisdiction), applying Iowa substantive law.

jury's inference that IBP's conduct caused Catipovic's termination would not be reasonable and would be no more than speculation.

Proximate cause is normally a question for the jury. *Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854, 858 (Iowa 1994). "A directed verdict may only be granted on the issue of proximate cause where the facts are clear and undisputed and relation to cause and effect so apparent to every candid mind that but one conclusion may be fairly drawn therefrom." *Oak Leaf Country Club Inc. v. Wilson*, 257 N.W.2d 739, 746 (Iowa 1977). The question is whether IBP's conduct was a substantial factor in causing Catipovic's termination, *and* whether Catipovic would have been terminated without IBP's actions. Iowa Civil Jury Instructions 700.3 (1996) (conduct of a party is a proximate cause of the damage when it is a substantial factor in producing damage and when the damage would not have happened except for the conduct). While a jury could have reasonably concluded IBP's actions were a substantial factor in Catipovic's termination, it would have been unreasonable for a jury to conclude that the Clinic would have retained Catipovic except for IBP's conduct.

The record reflects contact between IBP and the Clinic regarding Catipovic's medical work-releases in February 1998 and again in October 1998. The contacts were limited and did not establish an effort on IBP's part to entice or coerce the Clinic to terminate Catipovic. The evidence does not show any additional contact between IBP's management and the Clinic before his termination nearly a year later. Catipovic's only proof of a possible inducement was IBP's May 1998 pledge to donate funds to the clinic over the course of ten years.[8] However, the amount constituted

---

[8]The Clinic's donation request was for $50,000.00 per year for ten years. In a letter Schmitz indicated this request was "substantial" and was "out of the range of normal contributions pledged by I.B.P." but recommended that "I.B.P.'s involvement be of the highest level that the foundation committee finds acceptable." The IBP Foundation granted $10,000.00 a year for ten years.

only a fraction of the Clinic's annual 5 to 6 million dollar budget. The evidence does not show any link between the pledge and the termination of Catipovic's contract.

The record is clear however, that beginning in 1997, and just prior to Catipovic's termination, the Clinic, not IBP, had serious concerns regarding the performance of his contract. Catipovic's termination occurred within days of the issuance of a letter from the County Health Department sharply criticizing Catipovic's treatment of TB patients. The letter requested seven specific actions by the Clinic, including two directly addressing Catipovic's inadequate care of patients. Within days of this communication, the Clinic board met and decided to terminate Catipovic's contract. These facts indicate that Catipovic's employer had longstanding concerns with his services quite apart from his writing work-releases for IBP employees. Further, in response to the complaint filed with the Iowa Civil Rights Commission, the Clinic never mentioned IBP as part of the reason for Catipovic's discharge. A reasonable jury would not have been able to conclude that but for IBP's actions Catipovic would have been retained as an employee.

While the better practice is to permit the jury to decide the case before ruling on the motion for judgment as a matter of law, in the instant case, we cannot say the district court committed reversible error. For the foregoing reasons, we affirm the district court's grant of judgment as a matter of law.[9]

---

[9]Catipovic makes two additional evidentiary arguments–(1)the court erred in limiting each party to fifteen hours and (2) the court erred when it limited the use of Catipovic's testimony of Kemp's out-of-court statements. As Catipovic failed to object at the district court level, we review for plain error, *United States v. Kirkie*, 261 F.3d 761, 770 (8th Cir. 2001) (without objection the court reviews for plain error and reverses only if the error prejudices substantial rights of the party and would result in a miscarriage of justice). We find no plain error in the district court's evidentiary rulings.

JOHN R. GIBSON, Circuit Judge, concurring specially.

I concur fully in the opinion of the court today. However, I have two concerns with the conduct of the trial that cause me to expand upon the court's discussion.

By pre-trial order, the district court limited the trial time to thirty hours, dividing the time equally between plaintiff and defendant. Each party's fifteen hours included jury selection, opening statements, direct and cross examination of witnesses, hearings outside the presence of the jury on objections and other matters, and closing arguments. The court told counsel, "[W]hen you're on your feet, the clock is running." The stop-watch was kept by the judge's law clerk. Catipovic argues that the court erred in so limiting his case. As the court today correctly concludes, Catipovic failed to preserve this objection; when the district court asked him, after his last witness, whether he had more evidence, counsel replied, "There is none, Your Honor."

Under these circumstances, I agree that there is no reversible error, but nevertheless, I think it is well to recall the language in *Johnson v. Ashby*, 808 F.2d 676, 678 (8th Cir. 1987), penned by the late Judge Richard Sheppard Arnold:

> Trial courts have discretion to place reasonable limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence. See Fed. R. Evid. 403, 611; *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1171 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S. Ct. 234, 78 L. Ed.2d 226 (1983); *United States v. Article of Drug Consisting of 572 Boxes, More or Less*, 415 F.2d 390, 392 (5th Cir. 1969). "[I]n this era of crowded district court dockets federal district court judges not only may but must exercise strict control over the length of trials." *Flaminio v. Honda Motor Co., Ltd.*, 733 F.2d 463, 473 (7th Cir. 1984). Nonetheless, it may be an abuse of the trial court's discretion to exclude probative, non-cumulative evidence simply because its introduction will cause delay, and any time limits formulated in advance of trial must be

-10-

fashioned with this in mind. Such limits should be "sufficiently flexible to accommodate adjustment if it appears during trial that the court's initial assessment was too restrictive." *MCI*, 708 F.2d at 1171 (footnote omitted).

Accordingly, we join the Seventh Circuit in disapproving rigid hour limits such as those initially suggested here. See *Flaminio*, 733 F.2d at 473 (disapproving a rigid hour limitation involving a time-keeping method "almost as complicated as in a professional football game.") We further think that limits like those ultimately adopted by the District Court, if too strictly adhered to, would also be improper.

Further, with respect to the district court's grant of judgment as a matter of law at the conclusion of plaintiff's evidence, I think it also well to remember language also penned by Judge Richard Arnold in *Dace v. ACF Industries, Inc.*, 722 F.2d 374, 379 n.9 (8th Cir. 1983), *adhered to on denial of rehearing*, 728 F.2d 976 (8th Cir. 1984):

This case illustrates again that it is usually better practice for a district court, faced with a motion for directed verdict, to allow the case to go to the jury, and address the issue by way of judgment n.o.v. if necessary. The jury may find for the moving party, in which case the issue disappears. If the verdict is against the moving party, and if judgment n.o.v. is granted, and if this Court decides on appeal that it should have been denied, the verdict can simply be reinstated, and no new trial is necessary.

———————————————————