In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-1606

JERI L. GATES,

*Plaintiff-Appellant,*

*v.*

CATERPILLAR, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04-C-1160—**Michael M. Mihm,** *Judge.*

ARGUED FEBRUARY 7, 2007—DECIDED JANUARY 16, 2008

Before FLAUM, ROVNER and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Jeri L. Gates alleges that
Caterpillar, Inc. ("Caterpillar") engaged in unlawful
sexual discrimination and retaliation in violation of
Title VII. The district court granted Caterpillar's motion
for summary judgment, Gates appealed and we now
affirm.

**I**

Gates began working at Caterpillar in 1978 as a clerk
and held various administrative positions at the com-
pany between 1978 and 1990. In October 1990, Gates

joined the New Technology Department ("NTD") of Caterpillar's Technical Services Division ("TSD") as an Assistant Contract Administrator, becoming a Contract Administrator in 1997. As such, Gates was responsible for administering various aspects of Caterpillar's contracts including "closing out" contracts by confirming that Caterpillar had fulfilled its delivery obligations, the customer had paid Caterpillar and both sides agreed that the contract was complete.

In late 2001, Randall Richards joined the TSD and became Gates' supervisor. At the outset Richards, with input from Gates, assessed the department's workload and productivity and ultimately determined that the unit would benefit from hiring additional employees. Because Gates was the most experienced employee in the group, she became responsible for training and coaching some of the new unit members. At that time, Richards offered her the role of "Team Leader," which would have involved officially managing the work performance of the others in the group. Gates, dissatisfied with various aspects of the job, declined.

Both before and after Richards joined the TSD, Gates had applied for open positions within other divisions of Caterpillar in an effort to advance her career. Although she consistently sought the support of her supervisors in making this internal job switch, Gates believed that she did not have her superiors' backing because her leaving the group would create a void. In February 2002, Gates met with Barbara Shane, then TSD's Personnel Services Supervisor, to discuss the situation. In an effort to address Gates' concerns, Shane facilitated a meeting between herself, Richards and Mike Simmons (Richards' supervisor). This meeting was followed by a series of meetings between Gates, Shane, Richards and Simmons in mid-to-late-February. Although Gates continued to make clear that she wanted to leave the unit to pursue

other opportunities within Caterpillar, her supervisors determined that she should not transition to another position until the new administrators in the department were properly trained. Eventually, in March 2002, Gates, Shane, Richards and Simmons agreed to designate Shane as the "Training Leader" and established new work goals for her.

Shortly thereafter, Richards became critical of Gates' job performance and her failure to meet these new work goals. Also around this same time, Richards began hearing complaints from Gates' coworkers that Gates was spending a lot of time on personal matters. At Richards' request, Shane initiated an investigation, asking Amy Winkler, a Personnel Assistant in Caterpillar's Human Resources Department, to look into Gates' telephone and Internet usage while at work. At that time, Caterpillar employees were subject to an Electronic Communications Policy which, in relevant part, directed that personal use should be limited and governed by good judgment and discretion. Winkler reported that over the course of the 89 recent work days she reviewed, Gates made 489 calls from her telephone exchange, the majority of which (432) were personal. Winkler also found that between January 10 and April 30, 2002, Gates was on the Internet an average of 18 minutes a day, making approximately 2700 "hits" to Bradley University (where Gates was a student) and approximately 316 hits to other non-work-related websites including tanning equipment websites and a tax website.[1]

Shane and Richards reviewed the telephone and Internet usage reports, which they believed to be accurate and which they thought indicated an abuse by Gates of

---

[1] Gates does not dispute that she herself made the calls or visited those websites.

Caterpillar's phone and computer policy. Shane, Richards, Winkler and Randy Koors (the Business Support Manager in the TSD Support Services Department who was scheduled to take over responsibility for supervising the contract administrative employees in the upcoming months) discussed the situation. Upon a recommendation from Shane, Richards decided to suspend Gates.

On May 24, 2002, Richards and Shane met with Gates, informed her that she was suspended for five days and presented her with an Employee Action Plan ("EAP"). The EAP explained that Gates was being disciplined for her misuse of Caterpillar's time and equipment as well as her failure to take adequate responsibility for work assignments. The EAP mandated, and Richards verbally reiterated, that over the course of her suspension, Gates was to contact only Richards, if necessary, and should not contact any other team-members or co-workers at TSD. The EAP cautioned that "[f]ailure to adhere to the policies specifically noted above, as well as any other company policies will result in termination." R. 18, Ex. V. Richards also told Gates that following the suspension, her performance would be evaluated relative to a specific contract close-out and training schedule, a copy of which he gave to her at that time.

While Gates was on suspension, Richards, through Caterpillar's email system, received an email from Gates protesting her suspension. In the course of preparing a "rebuttal" and in an effort to buttress her position that Richards' closeout schedule was unreasonable, Gates also emailed various Caterpillar customers as well as contractors at other companies to solicit their opinions on contract close-out timing. All of these emails were sent from Gates' Caterpillar account, through Caterpillar's intranet which Gates accessed using her fiancé's "I-Pass" card, an access card issued by Caterpillar to allow access to the Company's information system and intended and

authorized only for use by the employee to whom it was issued.

On June 3, 2002, Gates returned to work from her disciplinary suspension, met with Richards, Shane and Koors and presented her written rebuttal of the EAP. When asked by Richards how she had emailed him during her suspension, Gates replied that she logged into her email account using her ID and password. When pressed further about how she gained access to the intranet, Gates replied that she used her fiancé's I-Pass card because hers was in her bag at work.[2] Although Gates initially claimed that her fiancé logged into the system from home before leaving for work, after which she then used her own password to access her email, Richards and Shane had records indicating that her fiancé was often already at work at the times his I-Pass card was used to access the system remotely. Gates then admitted she had in fact used her fiancé's I-Pass card to log into the system when he was not there.

In a letter dated June 5, 2002, Caterpillar notified Gates that based on its belief that Gates had continued to misuse company property and was dishonest about how she accessed the internal email system during her suspension, Gates was terminated. In May 2004, Gates brought an action against Caterpillar alleging unlawful discrimination and retaliation.

## II

### A.  Gates' Retaliation Claim

We review the district court's grant of summary judgment de novo. *E.g.*, *Luks v. Baxter Healthcare Corp.*, 467

---

[2] During the June 3 meeting, Caterpillar Security inspected Gates' bag but found no I-Pass card.

F.3d 1049, 1052 (7th Cir. 2006), *cert. denied*, 127 S. Ct. 2251 (2007). Summary judgment is properly granted when, after considering the admissible evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Id.*

Gates' primary argument on appeal is that the district court improperly failed to recognize that she could rely on circumstantial evidence to support her retaliation claim under the direct-proof method. Although we agree with Gates that the district court's total reliance on *Stone v. City of Indianapolis Public Utilities Division,* 281 F.3d 640 (7th Cir. 2002) for determination of this issue is misplaced, we nevertheless conclude that there is no reversible error.

In relevant part, Title VII renders unlawful the discrimination against any employee for opposing an unlawful employment practice. 42 U.S.C. § 2000e-3a. An employee bringing a retaliation claim may use either the "direct" or "indirect" methods of proof to support her claim. *Mannie v. Potter*, 394 F.3d 997, 983 (7th Cir. 2005). In order to successfully establish retaliation under the direct method of proof, Gates would have had to "[1] offer evidence that [she] engaged in a statutorily protected activity, [2] that the defendants subjected [her] to an adverse employment action and [3] that a causal connection exists between the two events." *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006). The court below relied on *Stone* to conclude that "in pursuing retaliation claims under the direct method, a plaintiff must present direct evidence, that is an acknowledgement of discriminatory intent that does not require support from inferences." R. 33, p. 13. However, this Court recently has clarified that, notwithstanding *Stone*'s "misleading dictum," "circumstantial evidence that is relevant and probative on any of the elements of a direct case of retaliation may be admitted and, if proven to the satisfaction of the trier of

fact, support a case of retaliation." *Treadwell*, 455 F.3d at 781 (citing *Sylvester v. SOS Children's Vills. of Illinois*, 453 F.3d 900, 902 (7th Cir. 2006)).[3] Under *Sylvester* and *Treadwell*, then, Gates *may* have made a showing, by means of circumstantial evidence, "'that [s]he engaged in protected activity … and as a result suffered the adverse employment action of which [s]he complains.'" *Sylvester*, 453 F.3d at 902 (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 545-46 (7th Cir. 2005); citing, *inter alia*, *Lang v. Illinois Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004); *Volovsek v. Wisconsin Dep't of Agriculture, Trade & Consumer Prot.,* 344 F.3d 680, 689 (7th Cir. 2003)). Unfortunately for her claim, Gates failed to do so.

We have determined that the relationship between Gates' complaints and her subsequent suspension and termination are so tenuous that summary judgment for Caterpillar cannot be avoided. We recognize that "[a] causal link between the protected expression and an adverse employment action may be established by showing that the protected conduct was a substantial or motivating factor in the employer's decision" *Culver,* 416 F.3d at 545; Gates fails to put forth even such evidence. Indeed, there is nothing Gates can point to that reasonably suggests that Caterpillar's actions were motivated by anything other than business judgment. At the time Caterpillar suspended Gates, her coworkers were complaining about her, her supervisors believed she was violating the company's electronics use policy and she was failing to meet her work goals. She was issued clear directions about what Caterpillar believed would be proper conduct during the course of her suspension and

---

[3] As the district court's opinion was issued before *Sylvester* and *Treadwell*, it did not have the benefit of our most recent clarifications of this issue.

she seemingly chose to ignore them. In light of this, Caterpillar's "adverse employment actions" seem motivated by nothing other than good business judgment and Gates provides no evidence to the contrary.

Because there is no causal connection we therefore need not reach the issue of whether Gates actually engaged in "protected activity". It is worth noting, however, that Gates' arguments in this area are weak. "Although an employee need not use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections, 'she has to at least say something to indicate her [gender] is an issue.'" *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (Title VII requires plaintiff to complain that she was discriminated "because of" gender, not merely that she felt "picked on" (quoting *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007-08 (7th Cir. 2000))). Although "[a]n employee can honestly believe she is the object of discrimination, . . . if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints." *Miller*, 203 F.3d at 1008.

In support of her argument, Gates points to a series of protests she made between the summer of 2001 and March 2002 during which she claims she made clear to other Caterpillar employees that her disputes with the company were related to gender discrimination. Specifically, Gates maintains that: (1) in August 2001, Gates complained to Richards that it was unfair that Kent Heisel, a male in another work unit within the division, whom she believed had job duties similar to hers, was at a higher salary classification; (2) in mid-January 2002, during her evaluation, Gates told Richards that she was frustrated by being kept in the department for so long; that "you wouldn't expect a man to remain in that type of job for so long"; that she should have gone to

an attorney in 2001 after she had unsuccessfully tried to leave the unit and that she was not going to put up with it any longer; (3) not long thereafter, Gates again approached Richards about leaving the unit, telling him that she wanted to move ahead in the company and she felt she was subject to a "glass ceiling" because of his unwillingness to support her promotion; (4) in February 2002, while discussing the "Team Leader" roles, Gates told Richards that if she were an "engineer," she would already have been in a higher pay classification; (5) later that month, Gates reiterated to Richards that she believed it unfair that she had a similar level of responsibility to Heisel but remained in a lower salary classification; and (6) following a meeting with Shane and Richards in early March 2002, Gates sent Shane an email stating that if things did not get better she would have no choice but to "go to the next step (whatever that is)."

Gates certainly can establish a history and record of informing her supervisors that she was unhappy in her position; the question is whether these statements, even taken as a whole and in the light most favorable to Gates, could be deemed to have put Caterpillar on notice that Gates was complaining of gender discrimination. Two remarks in particular, the "glass ceiling" comment and Gates' statement to Richards about how he would not expect a man to have stayed in her job for so long, give us some pause. The district court, however, concluded that the first assertion could not defeat Caterpillar's summary judgment motion, and we agree. In opposition to Caterpillar's motion for summary judgment, Gates, *for the first time*, states in an affidavit that she clearly told Richards during her February 2002 evaluation that he would not expect a man to have remained in that

position for that long.[4] When previously questioned about that meeting during her deposition, Gates said that she "was kind of pouring out [to Richards] what had happened" (R. 22, Ex. 9, 92:3-4) and yet never mentioned this comment about gender inequality. Although the affidavit statement does not necessarily conflict with Gates' testimony from her previous deposition, the *omission* of such a significant statement during her deposition in a sex discrimination case speaks volumes. Her explanation for not having mentioned this potentially vital remark during her deposition is that Caterpillar's lawyer "moved on to other areas" without asking her "specifically" what she told Richards so she was therefore "never asked to relate in detail that conversation". Ironically, however, in her own brief just sentences before, Gates enumerates for this Court several tidbits from that conversation that she said she volunteered ("[w]ithout being asked") during her deposition. In light of this, to

---

[4] Gates has not helped her cause, or the defendants theirs, with citations throughout their briefs only to the Statement of Facts or various paragraphs in the depositions, respectively. This Court's task to thoroughly assess the claims has been rendered unnecessarily burdensome, requiring searching through the entire record for particular, underlying information. "The Federal Rules of Appellate Procedure require that, '[n]o fact shall be stated in the statement of facts unless it is supported by a reference to the page or pages of the record or appendix where the fact appears.' Fed. R.App. P. 28(a)(7). *See also* Fed. R. App. P. 28(e); Circuit Rule 28(c); *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir.2004) (where the plaintiff has failed to cite the record, 'we will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him.'); *U.S. v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ('Judges are not like pigs, hunting for truffles buried in' the record.)." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 n.1 (7th Cir. 2006).

allow such evidence now would have the same effect as would allowing directly conflicting testimony; that is, "the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut." *Babrock v. Jewel Food Co.*, 773 F.2d 857 (7th Cir. 1985); *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996). We agree with the district court that this "new" assertion cannot defeat Caterpillar's summary judgment motion.[5]

---

[5] Although we reach the same conclusion we approach this issue from a different perspective. We take seriously the need, in reviewing a summary judgment motion, to balance the competing interests of determining whether a subsequent statement so clearly contradicts an earlier one so as to disallow it as a matter of law or whether it creates an issue of credibility more properly resolved by the trier of fact. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."). It is well established in this Circuit that, as a general rule, a party may not create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony in the absence of newly-discovered evidence or the unmistakable need to clarify prior ambiguous statements (*e.g.*, *Buckner v. Sam's Club, Inc.,* 75 F.3d 290, 292 (7th Cir. 1996); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995); *Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir. 1987); *Adelman-Tremblay v. Jewel Cos., Inc.*, 859, F.2d 517, 520-21 (7th Cir. 1988)). It is less obvious when, as in this case, the "new" statement adds to, without directly contradicting, prior testimony although the prior testimony is perfectly clear. "The concern in litigation, of course, is that a party will first admit no knowledge of a fact but will later come up with a specific recollection" dispositive to the case. *Buckner*, 75 F.3d at 293 (district court did not abuse its discretion in disallowing very specific descrip-

(continued...)

The "glass ceiling" comment is more troubling. Viewing the comment in light of the circumstances as a whole, however—that particular comment was a singular statement in a sea of more generalized grievances about job dissatisfaction made over a lengthy span of time—we cannot conclude that it would have been clear to Gates' employer that she was complaining about gender discrimination. In any event, the lack of a causal connection, as discussed *infra*, means that this Court need not rule today on whether Gates' "glass ceiling" comment, alone or in conjunction with Gates' other statements, so clearly invokes gender so as to satisfy the "protected activity" aspect of this inquiry.

Unable to make her case under the "direct" proof standard, then, Gates is left with the "indirect" method to attempt to withstand summary judgment against her retaliation claim. This requires a showing that, after opposing Caterpillar's alleged discrimination, Gates, and not other similarly situated employees who did not complain, was subjected to an adverse employment action even though her job performance was satisfactory. *Mannie*, 394 F.3d at 997.

---

[5] (...continued)
tion in affidavit after plaintiff's previous deposition offered merely general commentary on its physical nature when that specificity was necessary to establish causal link). Under the circumstances at hand here, where specific, gender-based complaints are vital to Gates' claim and where she made no mention of the statement in her deposition, it is reasonable to exclude it. It is important to note that the district court's decision to disregard parts of Gates' affidavit in this summary judgment motions must be reviewed for abuse of discretion (*e.g.*, *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003)) and, under this standard, "[d]ecisions that are reasonable, not arbitrary, will not be questioned." *Adusumilli v. City of Chicago*, 164 F.3d 353, 359 (7th Cir. 1998).

Gates' inability convincingly to show that her job perfor-
mance was satisfactory proves to be an insurmountable
hurdle for her. The proper inquiry mandates looking
at Gates' job performance through the eyes of her super-
visors at the time of her suspension and termination.
*E.g., Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329
(7th Cir. 2002) ("In most cases, when a district court
evaluates the question of whether an employee was
meeting an employer's legitimate employment expecta-
tions, the issue is not the employee's past performance
but 'whether the employee was performing well at the
time . . .'" (citations omitted)). As discussed *infra*, Gates
does not dispute that she consistently used the Com-
pany's telephone and Internet system for personal use
during her employment with the Company and the record
clearly supports Richards' increasing displeasure with
Gates' job performance. This coupling requires us to
conclude that Gates does not adequately show satis-
factory job performance at the time of her suspension.
Additionally, in violation of explicit orders and implicit
common sense, Gates used Caterpillar's intranet system
to contact customers and other work-related colleagues
while she was on suspension, which Caterpillar could
quite legitimately claim was inconsistent with its legiti-
mate expectations. Because this Court does not—and will
not—sit as "super-personnel" to question the wisdom or
business judgment of employers, this inquiry ends
here, with Gates' inability to sustain her burden. *See
Giannopolous v. Brach & Brock Confections, Inc.*, 109
F.3d 406, 410 (7th Cir. 1997) (it is not the province of
the court to decide whether the employer's reason was
wise, fair or correct, so long as it was really the reason).

## B. Gates' Discrimination Claim

Gates also argues on appeal that her proffered evidence
supports a *prima facie* finding of discrimination sufficient

to withstand Caterpillar's summary judgment motion. Under Title VII, employers may not discriminate "against any individual with respect to [his] compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under the well-established burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), in order to survive summary judgment Gates initially would have to show: (1) she was a member of a protected class; (2) she was meeting Caterpillar's legitimate job expectations; (3) she was subjected to a materially adverse employment action; and (4) others outside the protected class were more favorably treated. *Id.*, 411 U.S. at 802. If Gates could establish such a *prima facie* showing, Caterpillar would then have to articulate a legitimate, nondiscriminatory explanation for the employment action which Gates, finally, would have the opportunity to prove to be pretextual. *Luks*, 467 F.3d at 1055; *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). The court below found that Gates' discrimination claim failed because she was unable to meet either the second or fourth prongs of the *McDonnell Douglas* test. We agree.

We explain above that Gates was not meeting Caterpillar's legitimate expectations at the time of her suspension or her termination; she thus cannot satisfy the second requirement of the *prima facie* test. In support of her claim under the fourth prong of the test, Gates outlines three historical situations in which, she maintains, male Caterpillar employees misused the company's electronic equipment at least as egregiously as she did but were not similarly disciplined. They include: (1) a management employee with an arguably offensive screensaver who had visited various non-work-related websites who was not terminated; (2) Thomas Cox, an employee who was suspended without pay for three days

for inappropriate use of the Internet; and (3) another unidentified TSD male employee who was issued a written warning following complaints of inappropriate screensavers and misuse of company time for Internet use.

We recognize that to satisfy her burden Gates need not show that other employees are explicitly *identical* to herself—indeed, that would be a nearly insurmountable burden and this Court repeatedly has cautioned against a hyper-technical approach to this prong. *E.g.*, *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007); *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007). Gates must do more, however, than she has done: she must at least show that these men "'dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Snipes v. Illinois Dept. of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)). *See also Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002) (to meet his burden the plaintiff must demonstrate that there is someone directly comparable to him in all material respects); *Salas*, 493 F.3d at 923 (factors to consider include "whether the employees 1) had the same job description, 2) were subject to the same standards, 3) were subject to the same supervisor, and 4) had comparable experience, education, and other qualifications."). Not only is there no evidence that any of the three male employees reported to Richards,[6] but in addition, Gates'

---

[6] The fact that Shane was involved with all three disciplinary proceedings does not help Gates. Presumably Shane, as a member of the Human Resources Department, was involved in a multitude of situations where there were alleged infractions.

"evidence" of the men's alleged improper conduct fails to be functionally equivalent to Gates'. Significantly, in none of these examples does Gates allege a combination of improper Internet *and* telephone usage. Additionally, the limited information Gates provides, void of statistics or concrete data, is too vague to allow this Court to determine whether Gates and the men are "similarly situated." Finally, and critical to the inquiry of Gates' termination, there is absolutely no evidence that any of these men, while on suspension or being otherwise disciplined, engaged in further inappropriate conduct of any sort.[7]

Because this Court determines that Gates does not provide the evidence sufficient to make her prima facie case, the inquiry could properly end here. *Paluck v. Gooding Rubber Co.,* 221 F.3d 1003, 1011 (7th Cir. 2000).[8]

---

[7] Gates contends that the fact that a male employee was issued a 5 day suspension for falsifying time records whereas she was terminated for lying indicates disparate treatment. Without more specifics, this argument is meaningless. Caterpillar claims it fired Gates for *continued* misuse of its property as well as her dishonesty *while she was already suspended*. Gates provides no evidence that the other employee was similarly situated.

[8] Although Gates never makes it, there is support for the argument that where, as here, plaintiff argues that an employer's discipline is meted out in an uneven manner, the "legitimate expectations" inquiry dovetails with the "pretext" question. *E.g.*, *Curry v. Menard*, 270 F.3d 473 (7th Cir. 2001) (it makes no sense to evaluate whether the plaintiff is meeting "legitimate expectations" when she admits to violating company policies but is alleging she was punished more harshly than non-black employees who also violated the policy); *Elkhatib,* 493 F.3d at 831. Regardless, for reasons discussed *supra,* Gates fails adequately to produce evidence that Cater-
(continued...)

Taking the analysis to its logical conclusion, however, the summary judgment ruling still would stand: Caterpillar has set forth a legitimate, nondiscriminatory reason for Gates' suspension and subsequent termination and Gates has offered insufficient evidence of pretext. Whether or not Caterpillar may have been hasty or otherwise unwise in its discipline and subsequent termination of Gates is not for this Court to determine: "it is not the court's concern that that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Imeichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005); *Ptasznik*, 464 F.3d at 696 (pretext inquiry must focus on whether the employer's stated reason is honest, not well-reasoned, wise or accurate). There is nothing in the record to support a finding that Caterpillar's stated reasons for suspending and terminating Gates were fabrications. Absent such evidence, summary judgment is wholly appropriate. *Giannopolous*, 109 F.3d at 411.

For the foregoing reasons, the district court's judgment is AFFIRMED.

---

[8] (...continued)
pillar's stated reasons for Gates' suspension and subsequent termination were pretextual; under any analysis, then, Caterpillar properly is entitled to summary judgment.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*