# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-2811

GERALD C. ELLIS,

*Plaintiff-Appellant,*

*v.*

UNITED PARCEL SERVICE, INC.,

*Defendant-Appellee.*

_____

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 06-cv-00366-RLY-TAB—**Richard L. Young,** *Judge.*

_____

ARGUED JANUARY 25, 2008 — DECIDED APRIL 29, 2008

_____

Before BAUER, WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* This case centers around United Parcel Service's nonfraternization policy, which forbids a manager from having a romantic relationship with any hourly employee, even an employee the manager does not supervise. The purpose of this policy, according to UPS, is to prevent favoritism and the perception of favoritism. The policy extends to workers outside of a manager's supervisory authority because UPS says it frequently transfers managers and a manager could end up supervising any hourly employee. Unsurprisingly, this policy does not stop Cupid's arrow from striking at UPS.

As the discovery taken in this case reveals, intracompany dating is prevalent, although employees often take precautions to keep their relationships secret. Gerald Ellis was one such employee, but, unfortunately for him, he got caught. Ellis, who is an African-American,[1] sued UPS claiming it fired him because of his race and because he is married to a white woman, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and 42 U.S.C. § 1981. The district court granted summary judgment for UPS, and Ellis appeals.

Because this case comes to us at the summary judgment stage, we set out the facts in the light most favorable to Ellis, the nonmoving party. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 779 (7th Cir. 2007). Ellis began working for UPS as a driver in 1979. He worked his way up the ladder and eventually was promoted to Hub Supervisor in the Indianapolis sorting facility, a managerial position. In December 2000 the aroma of amour must have been filling the air at UPS as Ellis began dating Glenda Greathouse, a white woman who worked at UPS's phone center. But daily contact between Ellis and Greathouse, at least while at work, must have been sporadic as the phone center was in a different building from the sorting facility where Ellis worked. Anyway, for more than three years, Ellis kept mum at UPS about

---

[1] A debate is occurring about the appropriateness and accuracy of terms such as "African-American" and "Black," commonly used to describe a person's race. *See, e.g.,* Rachel L. Swarns, *'African-American' Becomes a Term for Debate*, N.Y. TIMES (Aug. 29, 2004), *available at* http://www.nytimes.com/2004/08/29/national/29african.html. Because Ellis identifies himself as an African-American, we will do the same.

the relationship, and Greathouse told only one close friend. But other employees eventually learned that Ellis and Greathouse were an item. Employee relations manager Brenda Baker got wind of the relationship and apparently didn't like it. She told Ellis's direct supervisor, Angela Wade, that "there were plenty of good sisters out there," which Wade understood to mean that Baker, who is African-American, thought Ellis should be dating African-American women. Wade, we should also add, is an African-American. Later, Ellis testified at his deposition that Baker called him a "sell-out" because he was dating Greathouse.

In February 2004 Ellis admitted to Wade that he was dating Greathouse. Wade testified at her deposition that she told Ellis he was "crazy" for dating Greathouse because, she explained, the relationship violated UPS's nonfraternization policy. She told Ellis that he or Greathouse would have to quit or Ellis would be fired. Wade reported the relationship to her supervisor, division manager Derick Craft. Craft, who is also an African-American, met with Wade and Ellis to discuss the relationship, and Ellis fessed up that he was dating Greathouse. Craft told Ellis that he was "crazy" to date "the white girl from the call center," and he ordered Ellis to meet with Kenny Walker, the human resources manager for the Indiana district, the next day. At that meeting, Walker, who like Baker, Wade, and Craft, is also an African-American, questioned Ellis about his relationship. Walker described the nonfraternization policy to Ellis, explained that Ellis's relationship with Greathouse violated the policy, and told Ellis that he had to "rectify the situation." Ellis testified that he understood that Walker expected him to end the relationship. Walker did not fol-

low up with Ellis or ask him whether he stopped seeing Greathouse. Walker testified that when implementing the nonfraternization policy it was his practice to explain the policy to the manager and to give the manager the option of ending the relationship or deciding which member of the couple would be let go. Walker said that he took managers at their word when they told him they would comply with the policy. Although Ellis testified that Walker did not tell him explicitly that resignation was an option, Ellis said that he and Greathouse discussed whether one of them should leave UPS.

Ellis did not end the relationship and neither did he or Greathouse resign. Instead, three days after the meeting with Walker—on Valentine's Day, no less—Ellis and Greathouse became engaged. A little over a year later, in April 2005, they were married. Ellis testified that he believed that their marriage brought him into compliance with the nonfraternization policy, although he admitted that he never asked Walker whether a marriage between a manager and an hourly employee violated the policy and never told Walker that he and Greathouse were married.

After they were married, Ellis and Greathouse still did not tell others at UPS about their relationship. But in July 2005, 3 months after their wedding and 17 months after Walker met with Ellis and discussed the UPS nonfraternization policy, Walker saw Ellis at a concert acting affectionately with a white woman. Walker later told Baker what he had seen, and she guessed, based on Walker's description, that the woman on the receiving end of Ellis's affections at the concert was Greathouse. Later that month, Walker met with Robert Severson, a district manager, and told him that Ellis might be in violation of the

nonfraternization policy. Severson told Walker to investigate and to review his findings with Lawrence Lewis, who is the North Central Region human resources manager, and a UPS in-house lawyer. District human resources managers, like Walker, consult with Lewis before disciplining employees so Lewis can ensure that policies are being enforced uniformly throughout the region. They also speak to in-house attorneys so that UPS can avoid unnecessary legal exposure. After consulting with Lewis and counsel, Walker determined that Ellis was in violation of the nonfraternization policy and that the "problem" had to be resolved. He met with Ellis and learned that Ellis and Greathouse were married. He then asked Ellis to resign. When Ellis refused, Walker fired him for violating the nonfraternization policy and for dishonesty. Walker, Severson, and Lewis testified at their depositions that Walker made the final decision to fire Ellis.

In granting UPS's motion for summary judgment, the district court determined that Ellis had not put forward sufficient direct or circumstantial evidence of discrimination to allow him to proceed by the direct method of proof. It then concluded he failed to present enough evidence to make out a prima facie case under the indirect method of proof because he could not show that any similarly situated employees who were involved in intraracial relationships at UPS were treated more favorably. Furthermore, even if he had come forward with enough evidence to establish a prima facie case, the court concluded that he could not show that UPS's reason for firing him was a pretext for discrimination.

We review the district court's grant of summary judgment *de novo*. *See Nichols*, 510 F.3d at 779. Summary judg-

ment is proper only when all of the evidence, taken together, shows that there is no genuine issue of any material fact and the moving party is entitled to judgment in its favor.

Ellis first argues that, under both the indirect and direct methods of proof, he put forward sufficient evidence to survive summary judgment on his claim that UPS fired him because he was involved in an interracial relationship. We have not yet decided whether an employer violates Title VII if it discriminates against an employee because the employee is involved in a relationship with a person of another race. *See Ineichen v. Ameritech*, 401 F.3d 956, 961-62 (7th Cir. 2005) (reserving the question). But we need not address the issue now because, even if discrimination on the basis of involvement in an interracial relationship constitutes illegal race discrimination, Ellis did not put forward enough evidence to survive summary judgment.

For Ellis to make out a prima facie case under the indirect method of proof, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), he had to come forward with evidence, among other things, that a similarly situated employee who was not involved in an interracial relationship was treated more favorably, *see Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Ellis identifies approximately twenty couples he says have been involved in *intra*racial romantic relationships that violated UPS's nonfraternization policy. He insists that the managers in all of these relationships either were not fired or were given the opportunity to have their partners resign; so, he argues, they were treated more favorably.

But most of Ellis's purported comparators are not similarly situated to him because they were not subject

to the same decisionmaker as Ellis when they purportedly violated the policy. Different decisionmakers may rely on different factors when deciding whether, and how severely, to discipline an employee. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000). So, to be similarly situated, a manager must have been treated more favorably by the same decisionmaker that fired the Ellis. *See Little v. Ill. Dep't of Rev.*, 369 F.3d 1007, 1012 (7th Cir. 2004). Ellis contends that he was fired by a group of decisionmakers, including Walker, Severson, Lewis, Craft, Baker, and the in-house lawyers. Thus, he argues that any manager involved in an intraracial relationship with an hourly employee is similarly situated if the manager worked under "the group." We disagree. UPS's evidence showed that Walker alone made the ultimate decision to fire Ellis, and Ellis has offered nothing to establish that anyone else was a decisionmaker. Walker apprised Severson, his boss, on the status of his investigation and Severson told him to consult with Lewis and in-house counsel, but Walker, Severson, and Lewis all testified that Walker was responsible for the decision to fire Ellis. As Severson suggested, Walker consulted with Lewis to ensure consistent enforcement of the nonfraternization policy, and with in-house counsel to discuss UPS's potential legal exposure. But this just shows that Walker used the resources at his disposal to make an informed decision; Ellis presented no evidence that Lewis or the in-house lawyers were the ultimate decisionmakers. *See*, *e.g.*, *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997) (evidence that supervisor discussed firing employee with others who did not have decisionmaking responsibility not sufficient to show they were decisionmakers). And Ellis presented no evidence that Craft and Baker were involved in the decision to fire him. Ellis did

not establish that anyone consulted Craft about Ellis's discharge, and although Baker was present at the meeting where Walker fired Ellis, Ellis put forward no evidence that she had influence over the decision.

So to avoid summary judgment, Ellis had to show that Walker treated managers in *intra*racial relationships with hourly employees more favorably, but the undisputed evidence showed that Walker was not the decisionmaker for most of the managers Ellis identifies. For some of his other purported comparators, Ellis failed to offer any admissible evidence that they were involved in romantic relationships with UPS employees at all. Instead, he relied on his former coworkers' conjecture and speculation that these illicit relationships occurred. One coworker testified at her deposition that she believed a manager was having an affair because she heard "rumors" about the purported relationship from "lots" of people. But rumor and conjecture are not enough to create a genuine issue of material fact as to whether these relationships happened, much less as to whether Walker knew about them and treated the managers more favorably. *See Markel v. Bd. of Regents of the Univ. of Wis. Sys.*, 276 F.3d 906, 912 (7th Cir. 2002); *see also Gusewelle v. City of Wood River*, 374 F.3d 569, 575 (7th Cir. 2004) (argument that "everybody knew" about plaintiff's living arrangements insufficient to show that a specific decisionmaker knew); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64-65 (2d Cir. 1997) (mere allegations, unsupported by admissible evidence, that supervisors at UPS violated nonfraternization policy insufficient to survive summary judgment).

That leaves four couples for which Ellis has offered evidence that a romantic relationship occurred and that Walker supervised. For one of these, however, Ellis offered

no evidence that Walker knew about the relationship. If Walker did not know that a particular manager was violating the nonfraternization policy, he could not have enforced the policy and disciplined the offending manager. *See*, *e.g.*, *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 682 (7th Cir. 2007); *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1366 (7th Cir. 1989); *Shumway*, 118 F.3d at 64-65. It cannot be said, therefore, that this manager was similarly situated to Ellis. Furthermore, Ellis established that Walker learned that another of the purported comparators was in violation of the policy in 2005, but it is undisputed that Walker left UPS soon after he learned about the relationship and before he could take any action. And the manager was eventually fired by someone else for violating the policy. So this manager, too, is not similarly situated to Ellis.

Regarding the two remaining couples, there is no evidence that Walker treated the managers who were violating the nonfraternization policy more favorably than he treated Ellis. First, Ellis presented evidence that manager Ann McKinley and hourly employee Jay Walls, who are both white, were involved in a romantic relationship and that Walker learned of the relationship in September 2005. But the evidence also showed that Walker met with McKinley and she promised she would end the relationship. Just as he did with Ellis, Walker believed McKinley when she told him that she would comply with the policy. Ellis put forward no evidence that McKinley continued the relationship after she told Walker she would end it. By contrast, after his meeting with Walker in 2004, Ellis persisted in violating the policy when he continued his romantic involvement with Greathouse. So, Ellis is not similarly situated with McKinley.

Ellis's last potential comparator, Angela Thompson, married hourly employee Andrew Loesch in 2002 (both Thompson and Loesch are white), and both still worked at UPS when Walker arrived in 2003, but Ellis offered no evidence that Thompson was treated more favorably. In 2004 Walker learned that Thompson and Loesch were married. He met with Thompon, explained that she was in violation of the nonfraternization policy, and told her that either she or Loesch had to resign. When Thompson said that neither would resign, Walker fired her. Ellis argues that Thompson was treated more favorably because Walker offered her the choice that either she or Loesch could resign. Ellis contends that, if Walker had given him this choice, Greathouse would have resigned. Walker testified that he gave Ellis this option at the meeting in 2004. Ellis disputes this, but he must have known that Greathouse's resignation could bring him into compliance with the policy because he testified that he and Greathouse discussed whether she should resign. In any event, this argument misses the point. Walker told both Thompson and Ellis that they were violating the policy and gave them both one opportunity to remedy the problem. Both refused, and both were fired. There is no evidence that Thompson was treated more favorably.

Ellis's failure to establish that any other similarly situated manager in an intraracial relationship was treated more favorably dooms his discrimination claim. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 691 (7th Cir. 2008); *Bio v. Fed. Express Corp.*, 424 F.3d 593, 596 (7th Cir. 2005). But even if he had established a prima facie case, Ellis could not establish that UPS's stated reason for firing him was a pretext for discrimination. *See Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2007) (if plaintiff establishes

prima facie case, burden shifts to defendant to provide legitimate, nondiscriminatory reason for firing). UPS says it fired Ellis because he violated the nonfraternization policy and because he had been dishonest. Ellis then had the burden to come forward with evidence that UPS's reason was a pretext for discrimination. *See id.* Evidence that an employer made a mistake or that the decision was ill-advised cannot meet this burden; an employer's explanation is a pretext for discrimination only if it is a lie. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 754 (7th Cir. 2006).

Ellis argues that UPS cannot rely on his relationship with Greathouse as a legitimate, nondiscriminatory reason for firing him because, he insists, UPS does not have a uniform nonfraternization policy. The nonfraternization policy is discussed in various UPS human resources materials including the UPS Policy Book, memoranda from Human Resources, and a UPS Web site. Ellis points out that some versions of the policy say that UPS "discourages" romantic relationships between managers and hourly employees, whereas others say that managers should "strictly avoid" such relationships. He argues that the different explanations establish that UPS does not have a consistent policy. To the contrary, although the policy may be expressed differently in various internal UPS documents, supervisors testified at their depositions that they understood the policy prohibited managers from dating hourly workers. Furthermore, Walker enforced the policy consistently among all managers. And even if Ellis thought that the policy only "discouraged," but did not forbid, him from dating Greathouse, Walker dispelled this interpretation in 2004 when Walker told him that the relationship violated the policy. Ellis also argues that

Walker should have adopted the most lenient interpretation possible, but nothing required Walker to do that. And even if Walker had adopted an interpretation of the policy that was too strict, evidence that an employer is too hard on an employee or makes a poorly reasoned or mistaken decision cannot establish pretext. *See Gates*, 513 F.3d at 691. Furthermore, Ellis testified that at the 2004 meeting he led Walker to believe that he would end his relationship with Greathouse, but he did not. Walker concluded that Ellis lied, so he fired him, at least in part, because of his perceived mendacity. Ellis offered nothing to dispute the truth of Walker's belief.

Ellis next argues that the district court should not have granted summary judgment because this is one of those "rare cases" where there is direct evidence of the employer's discriminatory intent. As direct evidence that he was fired because he is involved in an interracial relationship, Ellis points to comments Baker made that "there are plenty of good sisters out there" and that Ellis was a "sell-out" and Craft's purported remark that by "dating a white girl from the phone center" Ellis was "messing up his career." Derogatory remarks based on an employee's race can be direct evidence of discrimination if they are made by the decisionmaker (or by a person who influences the decisionmaker), near the time of the decision to fire the employee, and in relation to the employee's discharge. *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007); *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005); *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004). But Ellis put forward no evidence that Baker and Craft had influence over the decision to fire Ellis, and in any event, their remarks were made nearly a year and a half

before Ellis was fired. At most they show that some coworkers were unhappy that he was dating a white woman, but Ellis did not establish they reflected Walker's views or were connected to the decision to fire him. *See Ineichen*, 410 F.3d at 963. These comments are merely stray remarks unrelated to Walker's decision to fire Ellis, and they are not enough to show that UPS unlawfully discriminated against him. *See Nichols*, 510 F.3d at 781-82.

Finally, Ellis argues that he presented enough evidence to survive summary judgment, under the indirect method of proof, on his claim that UPS discriminated against him because he is an African-American. But for the reasons we have already discussed, we conclude that he did not. Some of this "evidence" was little more than workplace rumors; some of it failed to show that the decisionmaker had critical knowledge; and some of it fell short of rebutting UPS's facially nondiscriminatory concern about Ellis's lack of candor with the company. UPS was therefore entitled to summary judgment on this part of the case also.

In closing, we emphasize that our decision today should not be construed as an endorsement of the UPS nonfraternization policy. When a company like UPS runs expensive ads that ask "What can Brown do for you?" it might be wise for it to ask if this policy is really worth all of the fuss this case has created. As we observed in *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1353 (7th Cir. 1995):

> As the work force grows and people spend more of their time at work, the workplace inevitably becomes fertile ground for the dating and mating game. It is certainly not unusual, and it may even be desirable, for love to bloom in the workplace. Contiguity can lead

   to sexual interest, which can lead to soft music, candle-
   light dinners, serious romance, and marriage, or any
   stops along the way.

   By all accounts, Ellis was a good employee. He started
with UPS as a driver right out of high school in 1979 and
worked his way up to a managerial position. After 21
years with the company, he met a woman, apparently
fell in love, and, after a 4-year relationship, got engaged. A
year later he got married. That's a fairly nice story, and
so is the fact that Ellis and his wife were smooching at a
summer concert several months after their wedding.
Heck, some marriages today don't even *last* that long.
Although UPS, for the reasons we have stated, comes out
on top in this case, love and marriage are the losers.
Something just doesn't seem quite right about that.

   The judgment of the district court is AFFIRMED.