Filed 5/13/14  Madenlian v. State of California CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ARAM MADENLIAN,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>STATE OF CALIFORNIA, etc., et al.,<br><br>    Defendants and Respondents. | B233898<br><br>(Los Angeles County<br>Super. Ct. No. BC433404) |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County, Susan Bryant-Deason, Judge.  Affirmed in part; reversed in part.

Law Offices of Gregory W. Smith, Gregory W. Smith and Boris Koron; Benedon & Serlin, Douglas G. Benedon, Gerald M. Serlin and Kelly R. Horwitz for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Alicia M. B. Fowler, Senior Assistant Attorney General, Jerald L. Mosley, Mark Schreiber and Claudia Ramirez, Deputy Attorneys General, for Defendants and Respondents.

## I.  INTRODUCTION

Plaintiff, Aram Madenlian, appeals from a summary judgment entered in a discrimination lawsuit brought against defendants, State of California and the California Department of Corrections and Rehabilitation (the department).  Plaintiff contends he was the subject of unlawful discrimination based upon his race and ethnic background and retaliation in violation of the Fair Employment and Housing Act.  (Gov. Code, § 12940, subd. (a) & (h).[1])  In addition, plaintiff appeals from an order granting defendants' partially successful postjudgment motion for an award of expert witness fee.  We affirm the summary judgment but reverse the expert witness fee order.

## II.  THE PLEADINGS

Filed April 28, 2010, plaintiff's first amended complaint consists of two causes of action.  The first cause of action is for discrimination in violation of the Fair Employment and Housing Act.  The second cause of action is for retaliation.  Plaintiff alleges he:  is a Caucasian of Armenian descent; was hired as a correctional officer on November 5, 1994; in March 1997, became a parole agent; in December 2006, worked in a task force with the Los Angeles Police Department which focused on crime suppression; during 2006; and was the subject of a series of baseless investigations premised upon his "race and/or national origin/ancestry . . . ."  In September 2006, plaintiff and a supervisor, Erskine Richmond, spoke about the number of arrests of African-American parolees.  Agent Richmond said that Terrance Burns had complained about the number of arrests of African-American employees made by plaintiff.  Plaintiff responded by complaining he was being targeted because of his race.  Plaintiff allegedly complained to John Duncan who was in charge of the department's internal affairs office.  According to the first

---

[1]  Future statutory references are to the Government Code unless otherwise specified.

2

amended complaint, "On January 15, 2008, [p]laintiff wrote a letter to [Mr.] Duncan, the individual in charge of Office of Internal affairs, and the Office of the Inspector General, that [Mr.] Burns was discriminating against him on account of his race." On March 21, 2008, plaintiff was promoted to the position of Parole Agent II Assistant Unit Supervisor.

On October 8, 2008, plaintiff was informed he was the subject of another investigation. The investigation arose out of plaintiff's alleged misuse of an informant and false statements to a deputy public defender. As a result, plaintiff was terminated on May 28, 2008. Plaintiff alleges that he was the subject of discrimination based upon his race/national origin. And plaintiff alleges he filed two administrative complaints concerning the foregoing actions with the Department of Fair Employment and Housing and was issued a right to sue letter. The first administrative complaint, dated March 8, 2010, alleges: "Claimant was subjected to discrimination on account of his race/national origin by [Mr.] Burns and other African-American employees including (Kenneth Ford & Capril Anderson). Claimant protested he was subjected to racial discrimination in a letter dated January 15, 2008 and complained to Jason Marks and [Mr.] Richmond, claimant[']s field supervisor about racial discrimination. Claimant was later terminated in retaliation." In an administrative complaint dated April 21, 2010, plaintiff made a virtually identical allegation of discrimination and retaliation: "[Claimant] was subjected to discrimination on account of his race/national origin by [Mr.] Burns and other African-American employees including [Mr.] Ford & [Ms.] Anderson. Claimant complained about racial discrimination in a letter dated January 15, 2008 and complained to [Mr.] Marks and [Mr.] Richmond, claimant's field supervisor. Claimant was terminated after he made his complaints." As a result of the foregoing discriminatory and retaliatory conduct, plaintiff seeks actual and general damages, interest, injunctive relief and attorney fees. Defendants filed a general denial.

3

## III.  DEFENDANTS' SUMMARY JUDGMENT AND SUCCESSFUL EXPERT WITNESS FEES MOTIONS

On December 23, 2010, defendants filed a summary judgment or adjudication motion.  On April 19, 2011, the hearing was held on defendants' summary judgment motion.  Defendants' motion was granted on April 19, 2011.  Judgment was entered on May 17, 2011.  Plaintiff filed a notice of appeal from the judgment on June 20, 2011.

On June 15, 2011 defendants moved for an award of expert witness fees.  The motion was granted in part and defendants were awarded expert witness fees in the sum of $11,030.  The written order granting the post-judgment expert witness motion was filed September 19, 2011.  On October 5, 2011, plaintiff filed a notice of appeal from the September 19, 2011 post judgment order.


## IV. THE SUMMARY JUDGMENT MOTION WAS PROPERLY GRANTED


### A.  Defendants' Grounds And Evidence


Defendants asserted five grounds why summary judgment should entered:  as to both causes of action, plaintiff was terminated for non-discriminatory reasons; as to the second cause of action for retaliation, plaintiff cannot show he engaged in protected activity; as to the second cause of action, plaintiff cannot establish a causal link between the protected activity and his termination; as to the first cause of action, plaintiff failed to allege the discrimination resulted in an adverse employment action; and as to the first cause of action, all of plaintiff's claims are barred by the one-year statute of limitations.

Before proceeding to identifying the evidence relied upon by defendants, a brief discussion of the legal background underlying plaintiff's termination is in order.  As a parole officer, plaintiff was subject to department manuals and provisions of the

4

California Code of Regulations. California Code of Regulations, title 15, sections 3400 and 3401 regulate contacts between parole officers and parolees. Further, section 81020.28 of the department's operations manual prohibits recruiting, developing, or utilizing a parolee on a preplanned basis as an informant. As will be noted, other provisions of the California Code of Regulations and the department's operations manual are at issue. We will discuss these regulations and department policies in greater depth when analyzing the merits of the department's rationale for terminating plaintiff.

Defendants relied upon the following evidence. On November 5, 1994, plaintiff was hired as a correctional officer by the department. In March, 1997, plaintiff was transferred to the Division of Adult Parole Operations and became a parole agent.

On September 18, 2006, Mr. Burns, a department Employee Relations Officer, was present at a suppression of evidence motion hearing in Department 132 of Los Angeles Superior Court. Mr. Burns had been subpoenaed to appear on behalf of the department. The name of the accused in the case involving the motion to suppress evidence has been redacted by the parties. At the hearing, Judge Stephen A. Marcus granted the motion to suppress evidence. In granting the motion to suppress, Judge Marcus stated: "The other problems I have with this -- and I guess I do have to comment on this -- while I don't want to say that I discredit the parole officer for being unbelievable, I did have problems with a number of vague responses he gave. He didn't remember anything about the times. He didn't remember anything about how he got to this address or how he got into the room or -- it just wasn't very clear." Judge Marcus questioned and also credited some aspects of the accused's testimony. But after having done so, Judge Marcus stated: "But without discrediting the parole officer, I just have problems with his overall testimony and the vagueness of some of the answers. So the court's ruling is two-fold: [¶] No. 1, I do not feel the People have met their burden of proof, preponderance of the evidence, in showing that the defendant freely and voluntarily gave consent to a search of his apartment. [¶] Secondarily, I find that if there was consent given, and I found in the first case there wasn't, but even if there were

5

consent given, it was a result of either a prolonged detention or an illegal arrest, and a consent cannot be a result of unlawful police activity, and I would find there was unlawful police activity; they had no right to keep this individual for the amount of time -- and I'm estimating, and of course the officer only gave me 30 minutes; he said 20 minutes at the scene and at least 10 minutes at the police station, but it actually goes longer than that, because the detention continues for all the time it takes them to go to the hotel and search and find whatever they found. So it's the court's belief it has to be a minimum of an hour and, frankly, it sounded like more time than that."

As a result, Mr. Burns, who was present, prepared a memorandum to Martin O'Neal, a Regional Parole Administrator, summarizing the testimony and Judge Marcus's ruling. According to Mr. Burns, plaintiff and several other task force officers searched the accused's residence pursuant to an oral consent. Mr. Burns wrote: "The testimony provided by [plaintiff] . . . indicates that he and [another unidentified officer were] working as part of a Task Force. . . . [T]hey claimed they observed [the accused in] a narcotic transaction. . . . [W]hen they approached and detained [the accused no] drugs or unusual amount of money was found on his person. [Plaintiff] and [the unidentified officer] then detained [the accused] and apparently contacted Highway Patrol via their radio and determined that [the accused] was on probation. As such they claim that they arrested him and took him directly to the police station where subsequent permission to search the residence was provided. [¶] It was later discovered that [the accused] was not on probation and detaining him for the period of time in which they detained him was a violation of his rights. [¶] [I]t is not clear under what authority [plaintiff] arrested and detained a private citizen who was clearly not on parole. Secondly, there is an assertion by [the accused] that he was unlawfully detained and an unlawful search of his residence occurred prior to the alleged permission [being] given to the parole agents and LAPD. . . . Finally, it is determined that [the accused] was in fact driven around. [Plaintiff's] testimony at the court hearing was dishonest."

6

As a result, on April 2, 2007, plaintiff received a letter from the department's Office of Internal Affairs indicating he was subject to an administrative investigation as a result of the foregoing matter. On April 27, 2007, plaintiff was interviewed by Special Agent Frank Cantino. Plaintiff was represented by an attorney provided by the California Correctional Peace Officers Association. In a written memorandum, plaintiff stated, "I informed Cantino that this was a case of retaliation and racial discrimination by the Employee Relations Officer [Mr.] Burns, stemming from a previous investigation while I was still on the Fugitive Team. I also informed him that Mr. Burns had violated my [Peace Officer Bill of Rights] rights when he interrogated me at the court on 09/18/06." On September 28, 2007, plaintiff received an Amended Notice of Adverse Action dismissing him as a parole agent. The effective date of the termination was to be October 16, 2007. The findings arose from the detention and search of the accused on June 2, 2006 which was the subject of Judge Marcus's rulings. The September 28, 2007 adverse action was signed by Regional Parole Administrator Alfred Martinez, Jr. However, Mr. Martinez's September 28, 2007 termination decision was withdrawn because of an error in mailing the adverse action notice package to plaintiff. The withdrawal of the adverse action notice is noted in a memorandum signed by Mr. Martinez on October 17, 2007.

In a memorandum erroneously dated January 15, 2007, plaintiff alleged that those who investigated or made allegations against him acted inappropriately or committed perjury. Plaintiff requested that Mr. Burns, who was present during the hearing before Judge Marcus, and Investigator Cantino be investigated. In that memorandum, plaintiff argued: "This investigation was an orchestrated 'witch hunt.' I truly believe that Region III Headquarters and the Office of Internal Affairs will continue to initiate investigations against me. I don't believe they will rest until they have imposed some form of a sanction against me. I also believe that there are other individuals whom I will not name at this time, in Region III, who have through their silence, condoned these racially motivated, retaliatory acts. I will forward information regarding them at a later date."

7

Meanwhile, in 2006, plaintiff was assigned to the Downtown Skid Row Task Force which was also known as the Collaborative Law Enforcement Liaison Task Force. Plaintiff was assigned to this task force because of his knowledge of rules, regulations, policies and procedures as well as the fact that he had previously worked with other law enforcement agencies. Also, he was assigned because he was '"street smart'" and was able to work varied schedules. While working with the task force, plaintiff met a parolee. The parties have redacted the parolee's name. We will refer to the individual as "the parolee." Plaintiff met the parolee during a traffic stop for a minor infraction around December, 2006. Both the parolee and plaintiff were former Marines. During a subsequent internal affairs investigation, a report was prepared reflecting a conversation between plaintiff and the parolee: "[The parolee] also told [plaintiff] he was a Vietnam veteran was having difficulties with the V.A. Hospital on Wilshire. [Plaintiff] said [the parolee] somehow deduced that he was also a veteran, and [plaintiff] confirmed to him that he was a former Marine. He said [the parolee] apparently took a liking to him and began calling him "Cap,' which was short for Captain. [Plaintiff] indicated that he counseled [the parolee] and suggested that he try the V.A. Hospital in Long Beach. . . . At the end of the conversation, [plaintiff] said he gave [the parolee] his business card that identified him as a parole agent. He wrote down his cell phone number on the card . . . and told [the parolee] to call him if he needed anything." The parolee was supervised by parole agent Quaint Nguyen. Plaintiff never notified Agent Nguyen about the numerous contacts with the parolee.

Plaintiff denied using the parolee as an informant. However, during the internal affairs investigation, plaintiff admitted using the parolee to provide information. Plaintiff was interviewed during the internal affairs investigation. The following, as related during the internal affairs report, is uncontradicted: "On a few occasions, [plaintiff] said [the parolee] told him about alleged drug activities in the area. According to [plaintiff], most of the information either didn't make sense or seemed too far-fetched to him to be reliable. [The informant] didn't provide any information to him about specific

8

individuals, nor did [plaintiff] ask [the parolee] to get information on individuals known as 'Pac Man,' 'Stone,' 'Chu,' or 'Peanut.'" . . . [Plaintiff] said [the parolee] did offer to 'look at some spots', including Crabby Joe's Bar, but the areas and street locations were all well known to the task force.  He said he might have told [the parolee] to 'keep his eyes open,' but he never specifically directed [the informant] to do anything on his behalf.  [¶]  . . . [Plaintiff] said his contacts with [the parolee] were strictly over the telephone."  The internal affairs report contains other admissions, "He felt [the parolee] was just looking to belong to something, and his interest in providing information to [plaintiff] stemmed from a Marine Corps bond [the parolee] felt he had with him."  Plaintiff's denial the parolee acted as an informant was based on the following definition, "[Plaintiff] said he didn't believe that [the parolee] was acting as an informant when he provided him with information because nothing was given to [the parolee] in exchange for the information."  Plaintiff denied asking the parolee to engage in drug transactions or monitor narcotics activity at a specific skid row hotel.  Nor did the parolee provide information which led to an arrest.

On February 6, 2007, shortly after midnight, the parolee was arrested for possession of rock cocaine for purposes of sale by two Los Angeles police officers.  The parolee possessed a clear plastic bag containing objects resembling rock cocaine and $2,023.31 in his possession.  Plaintiff, who was also working at the same time, was advised of the arrest.  According to the police report prepared by then Los Angeles Police Department Officer Joe Ferreira, "I advised [plaintiff] of [the parolee's] parole status. [Plaintiff] identified himself and contacted the State Parole identification and warrants Section in order to confirm [the parolee's] parole status.  State Parole identification and warrants confirmed that [the parolee] was on active parole for narcotics."  As a result, a parole hold was entered against the parolee.

Deputy Public Defender Suzanne Vega represented the parolee after his arrest. During the internal affairs investigation, Ms. Vega was interviewed and according to a department report:  "She advised [the parolee] of the charges against him and asked what

9

happened. [The parolee] told [Ms. Vega] they get he could not understand why he was being prosecuted because he was supposed to be helping the cops. He told her he was working for [plaintiff], and he thought [plaintiff] was working with Officer Ferreira because [plaintiff] frequently mentioned Ferreira during his phone conversations with [the parolee]. [Plaintiff] never told [the parolee] that he was a parole agent, and [the parolee] was shocked when Vega told him that [plaintiff] was a parole agent." The parolee had thought plaintiff was a detective with the Los Angeles Police Department. According to the internal affairs investigation report, Ms. Vega related that the parolee had numerous telephone conversations with plaintiff. According to the report: "There were a number of phone calls exchanged between [plaintiff] and [the parolee.] [The parolee] was asked to make drug buys and provide intelligence about what was going on. He told Vega that [plaintiff] asked him to go to certain locations and certain hotels in the Skid Row Area and make drug buys. Those people would later be arrested."

Ms. Vega then subpoenaed the records for the cell phone assigned by the department to plaintiff. The records for plaintiff's cell phone were sent to Ms. Vega by a department employee, Maria Burns, on August 31, 2007. Those cell phone records indicated there were 110 telephone calls involving plaintiff and the parolee between December 6, 2006, and February 5, 2007. Ms. Vega then telephoned plaintiff. The department's internal affairs report details their conversation: "Vega called [plaintiff] and asked him if he knew [the parolee]. [Plaintiff] said the name did not sound familiar, and he asked Vega if she knew any of [the parolee's] aliases. Vega went through [the parolee's] rap sheet and recited some of [the parolee's] aliases. [Plaintiff] seemed to recognize one of the names, and he told Vega that he knew who she was talking about. [¶] [Plaintiff] told Vega that he met [the parolee] during a traffic stop. While talking during the traffic stop, [the parolee] and [plaintiff] discovered they had both been in the Marine Corps. [Plaintiff] said [the parolee] called him on the Marine [Corps'] birthday to say, 'Semper Fi.' He also told Vega that [the parolee] was not an informant. [Plaintiff] said it is a complicated process to get an informant, and that a file has to be made." After

10

their initial telephone conversation, plaintiff called Ms. Vega back. Plaintiff tried to convince Ms. Vega that the case against the parolee was weak for a variety of reasons. During the internal affairs investigation, Ms. Vega stated it was "very unusual" for an officer to call and point out the weaknesses of a prosecution case.

Ms. Vega then spoke to Deputy District Attorney Valerie Rocha. Ms. Vega related what she had learned from the subpoenaed cellular telephone records and her conversation with plaintiff. Ms. Rocha asked Ms. Vega to write a memorandum concerning plaintiff's conduct. Ms. Vega complied with Ms. Rocha's instructions concerning the memorandum.

The parolee's case was then assigned to Deputy District Attorney Dara Williams. Plaintiff's telephone records caught her attention. Ms. Williams then telephoned plaintiff. In their first telephone conversation, plaintiff denied knowing the parolee. Plaintiff also denied having any memory of the parolee's arrest. Ms. Williams was suspicious because of the 110 telephone calls between plaintiff and the parolee. In Ms. Williams's opinion, it was not unusual for a parolee to have the telephone number of a supervising parole officer. But, Ms. Williams thought it was unusual for a parolee to have the telephone number of a parole officer who was not providing direct supervision. Ms. Williams documented these concerns in a memorandum dated October 19, 2007. Ms. Williams then received another telephone call from plaintiff asking what was happening with the case and whether he would have to testify. In this second telephone conversation, plaintiff admitted that in fact he did know the parolee. During the internal affairs investigation Ms. Williams described this aspect of the second telephone conversation, "'I do recall that during that conversation he then at least sort of admitted that he did know the individual and it was sort of coming back to him.'"

On November 4, 2007, Senior Special Agent Andre Tate of the department's Office of Internal Affairs received a telephone call from Mark Ashen. Mr. Ashen was the Assistant Head Deputy of the Los Angeles County District Attorney's Office, Justice System Integrity Division. Mr. Ashen then followed up with a November 6, 2007 letter

11

that states in part: "In October 2007 this division received a complaint of misconduct against [plaintiff] from the Public Defender representing [the parolee]. [The parolee] who is charged with a drug trafficking offense, alleges he was an informant for [plaintiff] and that [plaintiff] was engaged in unauthorized and possibly criminal misconduct connected to [the parolee's] arrest. We are referring this matter to you to take whatever action you deem appropriate and have enclosed a copy of the material we received with the complaint."

On January 23, 2008, the department's internal affairs office decided to conduct an investigation. The allegations against plaintiff were investigated by Special Agents Tracy Hutchison, Sandra Carrizosa and Kimberly Kaufman. Their investigation uncovered the foregoing facts concerning the contacts between plaintiff and the parolee. As part of the investigation, they interviewed plaintiff, Ms. Vega , Ms. Williams , and the parolee. In addition, several parole agents, Mr. O'Neal, regional parole administrator for Region IV, and two police officers who were involved in the parolee's arrest were interviewed. Officer Derek Prude remained with the Los Angeles Police Department. Former Los Angeles Police Officer Joe Ferreira was now a Fontana police officer. As part of their investigation, 33 pieces of evidence or separate memoranda were reviewed.

The investigation concluded on October 22, 2008. (On March 21, 2008, plaintiff had been promoted to the position of Parole Agent II Assistant Unit Supervisor.) The investigation and its results were approved by Special Agent Kaufman, Senior Special Agent Tate and Mr. Dunkin, the Special Agent-In Charge of the Southern region internal affairs office. As a result of the investigation, the matter was referred to the district attorney.

On May 12, 2009, plaintiff was notified that he was terminated. The termination was effective May 28, 2009. The notification came in the form of a 12-page Notice of Adverse Action signed by Mr. Martinez. Mr. Martinez, as the regional parole administrator for Region III, had as one of his department duties as acting upon internal

affairs investigations. The notification indicates that plaintiff had never previously been the subject of an adverse action.

The notification begins with a statement of facts paralleling those we have previously described including: plaintiff's interactions with the informant; plaintiff's use of the parolee as an informant; Ms. Vega's discovery that plaintiff and the informant had 110 telephone conversations; Ms. Vega's disclosure of plaintiff's conversations with her; Ms. Williams's description of her conversations with plaintiff; plaintiff's failure to notify Parole Officer Nguyen about the parolee's activities; the department's policy concerning the use of parolees as informants; and plaintiff's dishonesty when speaking to Ms. Vega and Ms. Williams. The notification lists three statutory causes for termination-- inexcusable neglect of duty; dishonesty; and other failure of good behavior. (Gov. Code, § 19572, subds. (d), (f) & (t).) In addition, the notification identifies the following as additional grounds for termination: plaintiff had extensive contacts with the parolee thereby exhibiting undue familiarity (Cal. Code Regs., tit. 15, subd. 3400) ; plaintiff failed to notify the department of these extensive contacts (Cal. Code Regs., tit. 15, § 3401 subd. (c)); plaintiff improperly used the parolee as an informant in violation of section 81020.28 of the department's operations manual and such exhibited inexcusable neglect; plaintiff engaged in irresponsible or unethical conduct which reflected discredit on himself or the department (Cal. Code Regs., tit. 15, § 3391, subd. (a)); plaintiff failed to act with integrity, honesty and dependability (Cal. Code Regs., tit. 2, § 172); plaintiff failed to demonstrate professionalism, honesty and integrity and accept responsibility for his actions and their consequences as required by the department's operations manual in section 33030.3.1; and plaintiff failed to possess "the general qualifications of integrity, honesty . . . [and] good judgment" as required by section 33030.3.2 of the department's operations manual. Also, according to the notice, plaintiff failed to comply with the Law Enforcement Code of Ethics set forth in the department's operations manual section 33030.3.3. Section 33030.3.3 of the department's operations manual requires parole officers display a higher standard of conduct and be honest in thought and deed.

13

Additionally, the notice states plaintiff violated section 33030.3.3 of the department's operations manual when he was dishonest with Special Agents Hutchison and Carrizosa. The dishonesty consisted of plaintiff's denial during the internal affairs investigation of recruiting and using the parolee as an informant. These untrue denials were made by plaintiff to Special Agents Hutchison and Carrizosa. In addition, plaintiff had been dishonest when he originally feigned a lack of memory concerning the incidents related to the parolee. And, according to the notice, plaintiff committed inexcusable neglect and violated the duties imposed upon him by the department operations manual.

On May 26, 2009, a hearing pursuant to *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 215 was held before Mr. Martinez. Plaintiff did not attend. Plaintiff's California Correctional Peace Officers Association representative was Paul Labbe. Mr. Martinez's memorandum of the hearing which was directed at plaintiff states: "According to Mr. Labbe, you are off work on Workers' Compensation and could not attend the scheduled Skelly Hearing since you had a 'stay away order' from your doctor. When asked to elaborate on what this stay away order entailed, Mr. Labbe stated he could not because he has no knowledge of the Workers' Compensation system." After reviewing the evidence, Mr. Martinez upheld the May 13, 2009 adverse action notice. On January 20, 2010, Margo Baxter, the Special Assistant to the Director of the district attorney's Justice System Integrity Division sent a letter to Special Agent Kaufman. The letter confirmed that the district attorney declined to file criminal charges against plaintiff.

B. Defendant's Evidence

1. September 8, 2005 investigation request

On September 8, 2005, a internal affairs investigation request was filed naming plaintiff. The investigation request alleges that on June 30, 2005, plaintiff assaulted a

14

parolee named Ernesto Aguilera. On August 8, 2005, District Administrator Jerome Marsh forwarded a report concerning the allegations involving the parolee, Ernesto Aguilera, to Mr. Ford, Chief Deputy Regional Administrator. Mr. Marsh interviewed Mr. Aguilera and reported the following: "On Thursday, June 30, 2005, at approximately 9:50 AM, Parolee Aguilera along with his companion Gilbert C. (support person from the [Veterans Administration] Program he is residing in) reported to the El Monte Parole Office at the request of Parole Agent E. Perez, his assigned Agent at that time. The AM OD on duty at that time, contacted agent Perez in the field and Perez told the OD that they should tell his parolees that he would be in as soon as possible and they should wait. Parolee A[] waited until 1:25 PM and still had not been seen. He pressed the button and the PM OD came to the window and before the parolee could explain his situation, the agent (bald with a thin goatee in the middle of his chin, possibly Agent A. Madenlian) told him, to sit down. When the parolee tried a second time to tell the OD about the wait the OD told him[,] 'I told you to sit your ass down, your agent will call you when he is ready.' The parolee tried to explain that his agent was not in and that he needed to see someone. The OD at that time stated, 'What the hell do you want now?' When the parolee indicated he would like to see a supervisor the OD told him OK wait just a minute. The OD then returned with two other agents and the parolee was brought into the OD window area. The Parolee was placed on the wall and a pat down search was conducted. During that search both agents [Plaintiff] and [] were yelling at him and making derogatory comments about vets ('all you fucking vets think you are bad'). After he was searched he was pushed down onto a chair, and he tried to break his fall by putting his hand down and his weight was all on his wrist. He tried to hold on with his hand and his back twisted when he was pushed down on the chair. When he went back to the [Veterans Administration] Hospital he went to the emergency room for medical treatment (report attached). When the parolee tried to ask for names of the agents he was ignored but he did return on July 8, 2005 with Kenneth Crawford [], his Case Manager, and was unable to get any names at that time." Mr. Marsh also wrote: "[Mr. Aguilera]

15

indicated that he was pleasant with the agents and part of his program has to do with anger management and with [the] ability to walk away if a situation gets out of control. He did indicate that he had told one of the agents 'Fuck this parole office on his way out.'"

2. October 11, 2006 investigation request

On October 11, 2006, Mr. O'Neal, the regional parole administrator, requested that an investigation be conducted after a motion to suppress at which plaintiff testified was granted. We have previously detailed the evidence relating to the investigation requested by Mr. Burns. On September 26 and October 15, 2007, hearings were held pursuant to *Skelly v. State Personnel Bd.*, *supra*, 15 Cal.3d at page 215 concerning plaintiff's testimony before Judge Marcus. There was a wide-ranging discussion concerning the issues raised by the incident and the department's investigation. Mr. Martinez did not believe the facts presented during the discussion were persuasive enough to reduce the penalty of termination. However, Mr. Martinez's termination determination was withdrawn because of an error in mailing the adverse action notice package to plaintiff.

In addition, plaintiff relied upon defendants' responses to a production demand for the subpoena prepared by Maria Burns. The subpoena duces tecum apparently allegedly related to plaintiff's telephone records. In addition, the production demand sought copies of "court orders that were sent to" Ms. Burns concerning plaintiff's cell phone records. Defendants' response to the production demand indicates that no such documents ever existed.

16

### 3. November 20, 2006 internal affairs investigation request

On November 20, 2006, Mr. O'Neal, the regional parole administrator, issued a request for an internal affairs investigation of plaintiff. The investigation arose from a November 6, 2006 incident involving plaintiff and another parole agent as well as some Los Angeles police officers. In an effort to arrest a parolee who was in possession of two pellet guns, an altercation allegedly broke out. The allegations portion of the complaint form asserts that the parolee sustained injuries because of an unnecessary and excessive use of force. No discipline or adverse action was imposed because, "Central intake indicates the information does not establish a reasonable belief the allegations occurred." Mr. O'Neal signed a document dated May 4, 2007, indicating that there were insufficient facts to demonstrate a "reasonable belief" the excessive force allegations were true.

### 4. February 16, 2007 investigation request

On February 16, 2007, Mr. O'Neal issued a request for an internal affairs investigation of plaintiff. The complainant was Horacio Palomeres and the date of the alleged incident was November 2, 2006. Mr. O'Neal's internal affairs request alleges: "On or about November 2, 2006 while driving a Lincoln Continental . . . two men in black with Police/Parole on their jackets jumped out of their late-model white Chevy Malibu rushed and forced Mr. Palomeres against the wall while cursing and insulting Mr. Palomeres. He was never told the reason that he was being detained. He indicates that he has been handcuffed and searched. They demanded to search the car. They found nothing but continued to curse and threaten him. They eventually let him go. Mr. Palomeres filed a complaint with the local Police Department who determined that [plaintiff and another parole agent] who work as part of a specialized Task Force fit the description of the men who assailed Palomeres. Further, [plaintiff] does drive a white

17

Chevy Malibu as his work vehicle." On September 19, 2007, it was determined that no adverse action was to be taken. This was because Mr. Palomeres could not be located to provide testimony.

### 5. August 25, 2008 administrative investigation

In a September 4, 2008 letter, plaintiff was advised that he was subject to an internal affairs investigation initiated on August 25, 2008. The letter, authored by Mr. Cantino, states: "It is alleged, on February 7, 2007, you participated in a parole search without the proper authority. It is further alleged that you failed to report your activities to your superior and were insubordinate relative to your involvement in that search. It is alleged, November 7, 2006, you initiated a traffic stop and conducted a search of a non-parolee without any authority to do so. It is alleged, on March 29, 2007, you failed to adhere to department policy relative to your transportation of a detained parolee, Tate. It is further alleged that you employed unnecessary force against Tate and failed to properly report that use of force."

### 6. Other evidence

Plaintiff presented other evidence in support of his contention that he was the subject of race-based discrimination and was retaliated against for complaining about such. At his deposition, plaintiff testified concerning a conversation with Mr. Martinez that occurred in October of 2007. Plaintiff explained the purpose of the conversation: "I just felt like I had to . . . let him know what was going on. I didn't think . . . I was getting a fair shake because I knew that they were putting their twist on everything . . . ." Plaintiff described how the conversation ended: "I basically tried explaining to him what was going on with [Mr.] Burns and some of the racial things, and he dismissed my allegations or assertions and he got very irate with me, saying that he didn't -- he didn't

18

believe that, quote, unquote, shit, and that the last thing he said to me was, 'You'll see what will happen to you in the end.' And he hung up on me."

At his deposition, plaintiff testified concerning an "action" that Ms. Anderson took against him. Plaintiff testified: "She had a specific conversation with [Mr. Burns], [Mr.] Richmond, and [Mr.] Ford about the disproportional number of arrests made in the Skid Parole area by myself in terms of, you know, a disproportionately high rate of African-American arrests relative to other ethnicities and her belief that it was racially motivated on my part." Plaintiff could not remember with specificity when this conversation with Mr. Richmond occurred. Mr. O'Neal, was present at the meeting, said Ms. Anderson said, "'They seem to be arresting a disproportionately large number of [B]lacks.'" Mr. O'Neal was "kind of mystified" and "dumbfounded" by Ms. Anderson's comment as most parolees on skid row were African-American. Ms. Anderson's statement was made in January or February 2007 or shortly thereafter according to Mr. 'Neal. Mr. O'Neal knew of no conflict between plaintiff, on one hand, and, on the other hand, Mr. Richmond, Mr. Ford, Ms. Anderson, Ms. Burns and Mr. Marks. Mr. O'Neal suspected there was a conflict between plaintiff and Mr. Burns. However, Mr. O'Neal had no facts upon which to base his opinion.

Mr. O'Neal was deposed and expressed an opinion concerning the number of investigations involving plaintiff. Mr. O'Neal initiated more investigation requests for plaintiff than any other parole agent. Despite the express allegations of misconduct in the complaints, Mr. O'Neal, without conducting any investigation, concluded a majority of the allegations were unfounded. The remainder of the committee that evaluated misconduct allegations believed that they warranted investigation. Carlene Scott, who worked in the internal affairs intake unit, believed the committee members took issue with plaintiff. But when asked if there was any unfair treatment of plaintiff, Ms. Scott responded, "I can't say for sure how many cases were opened or not against [plaintiff], but we just really received a lot of just stuff and a lot of it was just stuff, and it wasn't really anything that you could work with." Officer Ferreira, who had no knowledge of

the department investigation, testified plaintiff should never have been investigated for allegations involving the parolee.

In addition, plaintiff presented evidence he asserts indicated manipulation of the charges involving the parolee. During January through March, 2008, Mr. Burns advised Mr. O'Neal that plaintiff was making excessive telephone calls. According to plaintiff, the excessive telephone call issue was resolved by way of an admonition by Mr. O'Neal. Mr. O'Neal, who had not conducted an investigation, thought it was impossible the plaintiff would use an informant. As a result, Mr. O'Neal did not favor opening an internal affairs investigation. Mr. O'Neal believed there was a "clear issue" with plaintiff given the number of internal affairs investigations. However, Mr. O'Neal testified, "[B]ut I did not know what it was." When asked whether the motivating reason investigations were forwarded was because of plaintiff's ethnicity, Mr. O'Neal testified, "I don't know that." At an unspecified time, the committee that reviewed internal affairs allegations were: Chief Deputy Regional Administrator Anderson, who is African-American; Mr. Ford, another chief deputy regional administrator, an African-American; Ivory Roberts, who is African-American, Mr. Burns, who is African-American. Mr. Burns was replaced by Ms. Burns, who was not related to him, and is Filipino.

## V.  DISCUSSION

### A.  Order Striking Plaintiff's Separate Statement

Plaintiff filed two separate statements.  The first separate statement responded to defendants' separate statement.  Plaintiff also filed his own separate statement of what he contended were undisputed facts.  The second separate statement purported to set forth what plaintiff contended were undisputed facts.  The trial court struck the second separate statement as it was not authorized by Code of Civil Procedure section 437c, subdivision (b)(3).  However, the trial court considered the evidence cited n the second separate statement.  Plaintiff argues reversal is warranted because trial court should not have stricken the second separate statement.

We need not address the merits of plaintiff's contention concerning his second separate statement.  Any purported error was harmless.  Citing California Constitution, article VI, section 13, our Supreme Court has explained any mistaken ruling relating to procedure is subject to harmless error analysis.  (*In re Marriage of Goddard* (2004) 33 Cal.4th 49, 56; see *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 [definition of miscarriage of justice].)  We review any alleged error of procedure for prejudice.  (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836; e.g. *In re Marriage of Goddard*, *supra*, 33 Cal.4th at pp. 52-60 [failure to introduce notice of trial into evidence although required by Code Civ. Proc., § 594, subd. (a) is reviewed for prejudice]; *Miller v. Murphy* (1921) 186 Cal. 344, 350 [failure to serve the defendants with proposed findings was not prejudicial and they may not be set aside on that ground on appeal]; *Baker v. Eilers Music Co.* (1917) 175 Cal. 652, 656 [premature signing of findings subject to harmless error review]; *In re Marriage of E. and Stephen P.* (2013) 213 Cal.App.4th 983, 987, 994-995 [failure to order an investigation and consider the resulting report concerning the best interests of a child as required by Fam. Code, §§ 7850-7851 was harmless error]; *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village*

*Square Venture Partners* (1997) 52 Cal.App.4th 867, 884 [trial court's belated signing of a summary adjudication order reviewed for harmless error]; *Parker v. City of Los Angeles* (1974) 44 Cal.App.3d 556, 566 [order granting of prematurely filed of cost memorandum reviewed for prejudice]; *Gunn v. Giraudo* (1941) 48 Cal.App.2d 622, 631 [probate court's exercise of general civil jurisdiction reviewed for prejudice].)  The trial court stated it considered all of the cited evidence in plaintiff's second separate statement, as have we.  Thus, any purported error in striking the second separate statement was entirely harmless.

## B.  Summary Judgment

### 1.  Overview

Plaintiff's claims have no merit.  After articulating the standard of review, we will set forth the context of the investigations and ultimate termination of plaintiff--his role as a peace officer.  Then we will discuss in order plaintiff's discrimination and retaliation claims.

### 2.  Standard of review

In *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-851 (*Aguilar*), our Supreme Court described a party's burdens on summary judgment motions as follows: "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.  That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. [Citation.]  There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing

22

the motion in accordance with the applicable standard of proof. . . . [¶] [T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.]" (Fns. omitted, see *ABCO, LLC v. Eversley* (2013) 213 Cal.App.4th 1092, 1097-1098.)

This is an employment discrimination case. Thus, circumstantial evidence is subject to the burden shifting process established in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802-803. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 356 (*Guz*).) But, because the present case arises in the summary judgment context, the so-called *McDonnell Douglas* test is slightly modified in the case of circumstantial evidence: "A defendant employer's motion for summary judgment slightly modifies the order of [the *McDonnell Douglas*] showings. If, as here, the motion for summary judgment relies in whole or in part on a showing of nondiscriminatory reasons for the discharge, the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for the termination. (See *Aguilar*, *supra*, 25 Cal.4th [at pp.] 850-851; cf. *Guz, supra,* 24 Cal.4th at p. 357.) To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred. (*Aguilar,* at pp. 850-851; *Guz,* at p. 357.) In determining whether these burdens were met, we must view the evidence in the light most favorable to plaintiff, as the nonmoving party, liberally construing her evidence while strictly scrutinizing defendant's. (*Aguilar,* at p. 856.)" (*Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1097-1098; see *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1005.)

We review the trial court's decision to grant the summary judgment motion de novo. (*Coral Constr., Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336; *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65, 67-68.) The trial court's stated reasons for granting summary judgment are not binding on us because we review its ruling not its rationale. (*Coral Constr., Inc. v. City and County of San Francisco, supra,* 50 Cal.4th at p. 336; *Continental Ins. Co. v. Columbus Line, Inc.* (2003) 107 Cal.App.4th 1190, 1196.) In addition, a summary judgment motion is directed to the issues framed by the pleadings. (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673, overruled on a different point in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527.) Those are the only issues a motion for summary judgment must address. (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1249-1250; *Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 364.)

### 3. Investigations Of Peace Officers

Plaintiff is a peace officer. As such, he is held to higher standards of conduct than others in our society. And investigation of misconduct allegations is an essential duty of policing agencies such as the department. Plaintiff's briefing here and in the trial court ignores this legal and moral imperative. Our Supreme Court has explained in a police discipline case: "[T]he public expects peace officers to be 'above suspicion of violation of the very laws [they are] sworn . . . to enforce.' [Citations.] Historically, peace officers have been held to a higher standard than other public employees, in part because they alone are the 'guardians of peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them.' [Citation.] To maintain the public's confidence in its police force, a law enforcement agency must promptly, thoroughly, and fairly investigate allegations of

officer misconduct; if warranted, it must institute disciplinary proceedings." (*Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 571-572; accord *Upland Police Officers Assn v. City of Upland* (2003) 111 Cal.App.4th 1294, 1302.) As a law enforcement agency, the department is required to establish procedures to investigate complaints against peace officers in its employ and maintain records of those investigations. (Pen. Code, § 832.5, subd. (a); see *Rezek v. Superior Court* (2012) 206 Cal.App.4th 633, 639; *Pena v. Municipal Court* (1979) 96 Cal.App.3d 77, 82.) The department has use of force reporting and investigation requirements for employees acting as field staff. (Cal. Code of Regs., tit. 15, §§ 3268, subd. (a), 3268.3.) A peace officer, for both off and on duty conduct, may be terminated for reasons far less serious than apply to other occupations. (*Cranston v. City of Richmond* (1985) 40 Cal.3d 755, 770, fn. 13; *McCain v. Sheridan* (1958) 160 Cal.App.2d 174, 177; *Cleu v. Board of Police Commissioners* (1906) 3 Cal.App. 174, 176.) It is in this context we examine plaintiff's discrimination and retaliation allegations. No doubt, there is no separate Fair Employment and Housing Act for peace officers. But they are subject by law to non-discriminatory occupational requirements and investigatory expectations that do not apply to other professionals.

### 4. First cause of action for discrimination

The first cause of action is premised upon three distinct actions: Mr. Burns, an African-American, "initiated numerous baseless investigations" against plaintiff; as a result of a November 6, 2007 letter from Mr. Ashen, plaintiff was the subject of a separate investigation; and he was terminated on May 28, 2008 as a result of the complaint letter filed by Mr. Ashen on behalf of the Los Angeles County District Attorney. As noted, a summary judgment motion is directed at the allegations in the operative complaint. (*Turner v. Anheuser-Busch, Inc., supra*, 7 Cal.4th at p. 1252; *Ann M. v. Pacific Plaza Shopping Center*, *supra*, 6 Cal.4th at p. 673.) Although the parties

25

advert to other issues, we will confine ourselves to the first amended complaint's allegations. We will initially explain why plaintiff's allegations in the first amended complaint he was discriminated against because numerous investigations were commenced has no merit. This includes the decision to investigate plaintiff based on Mr. Ashen's complaint concerning false statements to Ms. Vega and Ms. Williams. Then we will discuss why plaintiff's argument his termination was discriminatory has no merit.

To begin with, we address plaintiff's commencement of investigations argument. He argues the commencement of the investigations was based on racial and national origin discrimination. Discrimination claims under section 12940, subdivision (a) may be proven by direct or circumstantial evidence. (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 550; *Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1144.) There is no direct evidence of racial motivation. In terms of national origin discriminatory motivation, there is no direct nor circumstantial evidence. All of plaintiff's *national origin discrimination* claims are frivolous.

In terms of circumstantial evidence of *racial discrimination*, there is none. Plaintiff alleges in his first amended complaint he was the subject of several investigations which constituted unlawful discrimination. Each of the complaints finds a neutral nondiscriminatory basis in its origin and corresponding duty it be investigated. The September 8, 2005 complaint resulted from Mr. Aguilera's allegations of misconduct by plaintiff in the El Monte parole office. The November 20, 2006 internal affairs investigation request had its genesis in an excessive force allegation. Mr. Burns' November 21, 2006 memorandum about the ruling on the motion to suppress is premised upon testimony presented in court. And Mr. Burns' November 21, 2006 memorandum was based in part upon Judge Marcus's ruling granting the motion to suppress evidence; a ruling critical of plaintiff's testimony. The February 16, 2007 investigation request was premised on Mr. Palomeres's claim he was handcuffed and searched for no reason, sworn at and threatened. The possible identification of plaintiff resulted from an investigation by another police agency. Mr. Ashen's November 6, 2007 letter concerned plaintiff's

relationship with the parolee. Mr. Ashen was the assistant head deputy in the Public Integrity Division of the Office of the Los Angeles County District Attorney. Mr. Ashen's allegations were based upon allegations plaintiff lied to a deputy public defender and a deputy district attorney about the parolee's role as an informant. The August 25, 2008 administrative investigation resulted from allegations plaintiff conducted an illegal detention and search of a nonparolee.

Further, there is no evidence the commencement of these investigations which were premised on specific allegations of misconduct were motivated by any racial animus. Plaintiff relies on Ms. Anderson's comment in an unspecified meeting about alleged excessive arrests of African-Americans in the skid row area. There is no evidence she or any other participant in that meeting approved of an investigation because of her comment. Mr. O'Neal in fact thought it was odd as it reflected an unawareness on Ms. Anderson's part of the racial makeup of skid row parolees. Further, plaintiff's argument that race factored into the investigations because several of his superiors were African-Americans is meritless.

Moreover, plaintiff asserts he was the subject of more misconduct investigations than others. Hence, he argues this was circumstantial evidence of racial animus. No doubt, evidence other workers outside an employee's protected class were treated differently may be probative of racial animus. (*Gates v. Caterpillar, Inc.* (7th Cir. 2008) 513 F.3d 680, 690; *Guz*, *supra*, 24 Cal.4th at p. 369.) But there is no such evidence here. (*Hawn v. Exec. Jet Mgmt.* (9th Cir. 2010) 615 F.3d 1151, 1161 [absence of complaints may not be probative of disparate treatment theory]; *Silvera v. Orange County Sch. Bd.* (11th Cir. 2001) 244 F.3d 1253, 1259 ["'In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'"]; *Keel v. Roche* (M.D. Ala. 2003) 256 F.Supp.2d 1269, 1285 ["Plaintiff must show either that he was replaced by someone outside of the protected class or that a similarly situated employee who was not a member of the

27

protected class engaged in nearly identical conduct and was not discharged."]; *Meyer v. California & Hawaiian Sugar Co.* (9th Cir. 1981) 662 F.2d 637, 640 [when other employees who made similar remarks were not fired, the discharge of the plaintiff for racial remarks was not discriminatory because the impact of her statements on minority employees was greater].)

The only evidence is that the factually specific allegations were the subjects of investigations; only one of which resulted in discipline. As a general rule, no inference of discrimination may be drawn from a law enforcement agency's decision to investigate unprofessional conduct including: lying; excessive force; unlawful arrests, detentions or searches; profane interactions with the public; an improper relationship with a convicted felon; and violations of department regulations. Based on the evidence adduced in this case, no inference of discrimination may be drawn here. To sum up, the initiation of the investigations is not circumstantial evidence of racial animus.

The role of the citizen complaints and that of Mr. Burns was premised on under oath testimony and Judge Marcus's ruling in the investigations is important. They were the source of the misconduct investigations. In *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 231, a mixed motive case, our Supreme Court described the causation element imposed by section 12940, subdivision (a) thusly: "We are mindful, however, that section 12940[, subdivision ](a) does not purport to outlaw discriminatory thoughts, beliefs, or stray remarks that are unconnected to employment decisionmaking. Racist, sexist, or other biased comments in the workplace may give rise to a claim for unlawful harassment under a separate provision of the [Fair Employment and Housing Act]. (§ 12940, subd. (j); see *Lyle v. Warner Bros. Television Productions* (2006) 38 Cal.4th 264, 277-278.) But such comments alone do not support a claim under section 12940[, subdivision] (a), nor do bigoted thoughts or beliefs by themselves. Were it otherwise, the causation requirement in section 12940[, subdivision ](a) would be eviscerated. Section 12940[, subdivision] (a) does not prohibit discrimination 'in the air.' It prohibits discrimination that causes an employer 'to refuse to hire or employ the person or to

28

refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.'  (§ 12940(a).)"

Later in *Harris*, our Supreme Court described the causation element of a section 12940, subdivision (a) discrimination claim.  Our Supreme Court relied on the causation test described by Associate Justice Sandra Day O'Conner's concurring opinion in *Price Waterhouse v. Hopkins* (1989) 490 U.S. 228, 278.)  Our Supreme Court in *Harris* set forth Associate Justice O'Conner's concurring opinion:  "[W]e believe Justice O'Connor's concurring opinion in *Price Waterhouse* was correct to say that 'the plaintiff must produce evidence sufficient to show that an illegitimate criterion was a *substantial factor* in the particular employment decision . . . .'  (*Price Waterhouse*, *supra*, 490 U.S. at p. 278 (conc. opn. of O'Connor, J.) , italics added; see id. at p. 277 [concluding that 'decisionmakers [in Hopkins's case] placed substantial negative reliance on an illegitimate criterion . . . ].)  Requiring the plaintiff to show that discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor, more effectively ensures that liability will not be imposed based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision."  (*Harris v. City of Santa Monica*, *supra*, 56 Cal.4th at p. 232.)

The commencement of the investigations was not discriminatory within the meaning of section 12940, subdivision (a) given the foregoing causation requirement.  None of the other cited evidence shows a racial animus.  All of the investigations arose in the context of specific allegations plaintiff engaged in unlawful or unprofessional conduct as a peace officer.  Investigations by a law enforcement agency of such specific allegations under the facts presented here were not discriminatory.  There is no evidence Ms. Anderson's off-base comment about the racial makeup of skid row arrestees ever motivated an investigation.  Further, there is no evidence Mr. Burns acted with racial animus in any of his actions.  Basically, plaintiff's contention is that his supervisors were

29

African-American and hence commencing investigations of him in the face of specific misconduct allegations is discriminatory. As noted, this analysis is meritless. The department had a duty to investigate each of these fact-specific misconduct allegations directed at plaintiff. (*Pasadena Police Officers Assn. v. City of Pasadena*, *supra*, 51 Cal.3d at pp. 571-572; accord, *Upland Police Officers Assn v. City of Upland*, *supra*, 111 Cal.App.4th at p. 1302.)

The sole remaining alleged act of discrimination is plaintiff's termination. Plaintiff's arguments and his related pretext contention are without merit. It is uncontradicted: plaintiff maintained excessive contacts with the parolee (Cal. Code of Regs., tit. 15, § 3400); plaintiff failed to notify the department of these contacts (Cal. Code of Regs., tit. 15, § 3400); and plaintiff failed to advise Mr. Nguyen of the contacts with the parolee. Further, plaintiff collected information, none of it of any value, from the parolee about drug activity in the area. No doubt, plaintiff denies using the parolee as an informant. Plaintiff's characterization is legally irrelevant. Plaintiff admitted receiving unusable information concerning drug activity from the parolee. Plaintiff admitted the parolee's desire to provide information arose from their mutual bond because they were former Marines. Plaintiff's definition of an informant required something be provided in exchange for the information. An informant provides information. Plaintiff admitted that is what the parolee did. And this all arose in the context of 110 telephone contacts over a 2-month period. Collectively, all of these actions violated department policy and were nondiscriminatory reasons to terminate him.

Further, Mr. Martinez reasonably and in good faith could have concluded plaintiff lied during the internal affairs investigation. Plaintiff denied using the parolee as an informant. And plaintiff denied misleading Ms. Williams about the parolee's informant status. Lying during an internal investigation is a non-discriminatory reason for terminating an employee. (*E.E.O.C. v. Total System Services, Inc.* (2000) 221 F.3d 1171, 1176 ["[W]hen the circumstances give the employer good reason to believe that the fictitious version was the result of a knowingly false statement by one of its employees,

30

the law will not protect the employee's job."]; *Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1223 [defendant could reasonably rely on personnel board's finding that the employee made a false allegation of sexual harassment to terminate him].) And pretext is not shown by the fact that the employer was mistaken. (*E.E.O.C. v. Total System Services, Inc.*, *supra*, 221 F.3d at p. 1176; *Sempier v. Johnson & Higgins* (3rd Cir. 1995) 45 F.3d 724, 731.)

There is no merit to plaintiff's pretext argument. The internal affairs investigation that led to plaintiff's termination resulted from Mr. Ashen's complaint. The termination was the result of an internal affairs investigation conducted by Special Agents Hutchinson, Carrizosa and Kaufman. There is no evidence Mr. Martinez acted for any other reason; a subject we will discuss in greater detail shortly in terms of plaintiff's retaliation cause of action. We need not discuss the parties' remaining discrimination contentions.

5. Second cause of action for retaliation

Plaintiff alleges in his second cause of action he was terminated because he complained about racial discrimination directed at him by other department employees. (§ 12940, subd. (h).) In order to establish a retaliation claim our Supreme Court has explained: '[I]n order to establish a prima facie case of retaliation under the [Fair Employment and Housing Act], a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*); see *McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 298.) Protected activity within the meaning of section 12940, subdivision (h) includes complaining or threatening to complain about discriminatory conduct. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042; *Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 815.) Further, an

31

employer must act with a discriminatory or retaliatory motive or animus in order to be liable for unlawful retaliation. (*Joaquin v. City of Los Angeles, supra,* 202 Cal.App.4th at pp. 1226-1228; *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713, 715.) Also, the conduct which the employee complains about need not actually be prohibited by this State's antidiscrimination statutes: "It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the [Fair Employment and Housing Act]. [Citations.]" (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1043.) By their very nature, retaliation claims are reviewed on a case-by-case basis. (*Yanowitz, supra*, 36 Cal.4th at p. 1052; *Kelley v. The Conco Companies* (2011) 196 Cal.App.4th 191, 214.)

We need only address two reasons why plaintiff's retaliation cause of action has no merit. First, the termination decision was not made in temporal proximity to Mr. Martinez's alleged threat. Temporal proximity between protected (complaining about discriminatory conduct) conduct and adverse employment action (termination) can shift the burden of proof to an employer. Here, there is evidence plaintiff and Mr. Martinez had an argument over the telephone in October 2007. Plaintiff complained about Mr., Burns and "some of the racial things" to Mr. Martinez. Mr. Martinez became very irate and dismissed plaintiff's allegations. Mr. Martinez stated he did not believe the race discrimination allegations, characterized them as "'shit,'" and concluded, "'You'll see what happens to you in the end.'" Plaintiff was not terminated until May 28, 2009. In the intervening time period, no other investigation resulted in the imposition of any discipline on plaintiff.

There is no temporal relationship between Mr. Martinez's May 12, 2009 decision to terminate plaintiff and the October 2007 termination. A close temporal relationship between protected conduct and an adverse employment action creates an inference of retaliation. (*Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635,

653; *Scotch v. Art Institute of California-Orange County, Inc.* (2009) 173 Cal.App.4th 986, 1020; *Taylor v. City of Los Angeles Dept. of Water & Power* (2006) 144 Cal.App.4th 1216, 1235.) However, the United States Supreme Court has explained: "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close,' *Neal v. Ferguson Constr. Co.* [(10th Cir. 2001)] 237 F.3d 1248, 1253. . . . See e.g., *Richmond v. Oneok, Inc.* [10th Cir. 1997)] 120 F.3d 205, 209 . . . (3-month period insufficient); *Hughes v. Derwinski* [(7th Cir. 1992)] 967 F.2d 1168, 1174-1175 . . . (4-month period insufficient). Action taken (as here) 20 months later suggests, by itself, no causality at all." (*Clark County School Dist. v. Breeden* (2001) 532 U.S. 268, 273-274; see *Garrett v. University of Alabama and Birmingham Bd. of Trustees* (11th Cir. 2007) 507 F.3d 1306, 1316; *LeBoon v. Lancaster Jewish Community Center* (3d Cir. 2007) 503 F.3d 217, 232-233; *Villiarimo v. Aloha Island Air, Inc.* (9th Cir. 2002) 281 F.3d 1054, 1065; *Gorman-Bakos v. Cornell Coop. Extension* (2d Cir. 2001) 252 F.3d 545, 544-555.) Here, there was a one and one-half year delay between the angry October 2007 telephone conversation between plaintiff and Mr. Martinez and the May 12, 2009 notice of termination. This was insufficient to create an inference of retaliatory animus or rebut defendants' nondiscriminatory showing for the termination.

In addition, other factors plus the absence of temporal proximity demonstrate the complete paucity of indicia of retaliatory animus. Mr. Martinez declared he based his termination decision on the internal affairs report. And, on October 15, 2007, Mr. Martinez had withdrawn an amended adverse action resulting from Judge Marcus's order granting the unidentified suspect's motion to suppress. Other investigations did not result in any adverse employment actions. These additional factors, plus the passage of time, prevent plaintiff from drawing an inference of a discriminatory mens rea or rebutting defendants' showing no retaliatory animus was present. (See *LeBoon v.*

*Lancaster Jewish Community Center*, *supra*, 503 F.3d at p. 233-234; *Coszalter v. City of Salem* (9th Cir. 2003) 320 F.3d 968, 977-978.)

Second, as in connection with the discrimination claim, Mr. Martinez acted reasonably and in good faith in accepting the internal affairs investigation's findings. The same test we applied in our discrimination discussion assessing the evidence produced by the internal affairs investigators applies here. (*E.E.O.C. v. Total System Services, Inc.*, *supra*, 221 F.3d at p. 1176; *Joaquin v. City of Los Angeles, supra,* 202 Cal.App.4th at p. 1223.) Mr. Martinez could reasonably find, based on the internal affairs investigation, plaintiff's contacts with the parolee violated department regulations. Further, Mr. Martinez could reasonably find plaintiff was dishonest during the internal affairs investigation. Mr. Martinez stated under oath these were the reasons he made the termination decision. Plaintiff has presented insufficient evidence Mr. Martinez was not telling the truth. (*Green v. Mobis Alabama, LLC* (M.D.Ala. 2014) __ F.Supp.3d __, __ [2014 U.S. Dist. LEXIS 14542 *57] [retaliation claim had no merit as the employer could reasonably find the plaintiff submitted forged physician's notes]; *Plumlee v. City of Kennedale* (N.D. Tex. 2011) 795 F.Supp.2d 556, 564 [misconduct occurring or discovered during internal investigation defeated retaliation claim]; *Joaquin v. City of Los Angeles*, *supra*, 202 Cal.App.4th at p. 1223 [defendant's reasonable reliance on personnel board's finding the plaintiff lied during an investigation defeated retaliation claim].) We need not address the parties' remaining claims.

## C. Expert Witness Fees

After granting summary judgment, the trial court granted defendant's expert witness fee motion. While this case was pending on appeal, our colleagues in Division Eight of this appellate district addressed this issue in a fair Employment and Housing Act discrimination case. Our Division Eight colleagues held, in a case of first impression, expert witness fees may be recovered by a defendant only if the discrimination action is:

frivolous; unreasonable; without foundation; or brought in bad faith. (*Baker v. Mulholland Security & Patrol, Inc.* (2012) 204 Cal.App.4th 776, 782-783.) The entirety of plaintiff's claims is not frivolous, unreasonable, without foundation or brought in bad faith. No doubt, plaintiff's natural origin claim is frivolous. But as to the remainder of the case, it is not frivolous, unreasonable, without foundation, or brought in bad faith.

## VI. DISPOSITON

The summary judgment is affirmed. The expert witness fee order is reversed. Defendants, State of California and the California Department of Corrections and Rehabilitation, shall recover their costs incurred on appeal from plaintiff, Aram Madenlian.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

I concur:

KRIEGLER, J.

35

MOSK, J., Dissenting

I dissent because I disagree with that part of the majority's opinion that affirms the trial court's order summarily adjudicating plaintiff and appellant Aram Madenlian's cause of action for retaliation.[1]  Thus, I would reverse the summary judgment and the order summarily adjudicating Madenlian's retaliation cause of action.  I agree with the majority in connection with the order awarding defendant and respondent California Department of Corrections and Rehabilitation (CDCR) expert witness fees and the order summarily adjudicating Madenlian's race and national origin discrimination cause of action.

In conducting our de novo review of the trial court's order granting summary judgment, we view the evidence in the light most favorable to the losing party.  (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.)  We liberally construe the losing party's evidence and strictly construe the prevailing party's evidence, resolving any evidentiary doubts or ambiguities in the losing party's favor.  (*Ibid.*)  "Summary judgment is a severe remedy which is to be granted with caution."  (*Paper Savers, Inc. v. Nacsa* (1996) 51 Cal.App.4th 1090, 1094.)

The Fair Employment and Housing Act (FEHA) provides that it is an unlawful employment practice for an "'employer . . . to discharge . . . any person because the person has opposed any practices forbidden under this part . . . .'"  An employee may demonstrate a prima facie case of unlawful retaliation by showing that (1) he engaged in activities protected by the FEHA, (2) his employer subsequently took an adverse employment action against him, and (3) there was a causal connection between the employee's protected activity and the employer's adverse employment action.  (*Miller v.*

---

[1]      The majority affirms the trial court's grant of summary judgment as to Madenlian's entire action.  The trial court alternatively granted summary adjudication of Madenlian's discrimination and retaliation causes of action.

*Department of Corrections* (2005) 36 Cal.4th 446, 472.)  The employer's retaliatory motive is "'"proved by showing that plaintiff engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time thereafter." [Citation.]  "The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision.'" [Citation.]' [Citation.]"  (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69-70.)

We apply the test in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*) to claims of retaliation based on circumstantial evidence.  (*Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 155.)  "In a retaliation case, the *McDonnell Douglas* test 'require[s] that (1) the plaintiff establish a prima facie case of retaliation, (2) the defendant articulate a legitimate nonretaliatory explanation for its acts, and (3) the plaintiff show that the defendant's proffered explanation is merely a pretext for the illegal termination . . . .' [Citation.]"  (*Id.* at pp. 155-156.)

"'A defendant employer's motion for summary judgment slightly modifies the order of [the *McDonnell Douglas*] showings. . . .'"  (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1005.)  Under that modified order, the employer has the initial burden to either (1) negate an essential element of the employee's prima facie case or (2) establish a legitimate, nonretaliatory reason for terminating the employee.  (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 160.)  Madenlian demonstrated a prima facie case of unlawful retaliation by presenting evidence that showed that he engaged in an activity protected by the FEHA; his employer, CDCR, subsequently took an adverse employment action against him; and there was a causal connection between his protected activity and CDCR's adverse employment action.  (*Miller v. Department of Corrections, supra,* 36 Cal.4th at p. 472; *Sada v. Robert F. Kennedy Medical Center, supra,* 56 Cal.App.4th at pp. 155-156.)

2

There is evidence showing that Madenlian engaged in an activity protected by the FEHA when he complained to Alfred Martinez, Jr., Regional Parole Administrator for Region III of the Division of Adult Parole Operations, that Terrance Burns was racially discriminating against him. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1043, fn. omitted ["It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA"].) CDCR took an adverse employment action against Madenlian when it terminated his employment. (Gov. Code, § 12940, subd. (h); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 [termination is an adverse employment action].) There is evidence of a causal connection between Madenlian's complaint to Martinez about Burns and his termination. According to Madenlian, in a telephone call with Martinez, Martinez "dismissed" his allegations and became "very irate" with him. Martinez said that he did not believe "that . . . shit," and said to Madenlian, "You'll see what will happen to you in the end." Martinez then hung up on Madenlian. Within three months of Madenlian's complaint about Burns, Martinez initiated the internal affairs investigation that led to Madenlian's termination; and Martinez made the decision to terminate Madenlian's employment.

Some courts have held that causation may not be established based on proximity of time alone when the time between the protected activity and adverse employment action are insufficiently close. (*Holtzclaw v. Certainteed Corp.* (E.D.Cal.2011) 795 F.Supp.2d 996, 1020 ["Courts have found a three-month period between the protected activity and the adverse employment action insufficiently close to support a finding of causation based on proximity of time. [Citations.]"].) Causation in this case does not, however, depend on proximity of time alone. As stated above, the person who ultimately terminated Madenlian—Martinez—angrily responded to Madenlian's complaint of racial discrimination by Burns, characterizing the complaint as "shit" and telling Madenlian that

3

"[y]ou'll see what will happen to you in the end." To the extent that proximity in time is relevant in this case, it goes only to the weight of Madenlian's case and is not dispositive.

Madenlian also presented evidence that CDCR's proffered legitimate reason for terminating his employment—his misconduct in the matter with the parolee—was a pretext for retaliation. (*Sada v. Robert F. Kennedy Medical Center, supra,* 56 Cal.App.4th at p. 155.) Martin O'Neal, the Regional Parole Administrator before Martinez, testified in his deposition that Madenlian's misconduct in that matter only merited an admonition. Martinez, who arguably threatened Madenlian—"You'll see what will happen to you in the end"—when Madenlian complained about Burns's alleged racial discrimination, made the decision to terminate Madenlian's employment. (*Id.* at p. 156 [pretext may be inferred from the identity of person making the adverse employment decision].) Madenlian notes that the District Attorney did not choose to prosecute him, the parolee's statement was not credible, and he did not make a false statement because he did not recognize the name of the parolee given by the investigator rather than the moniker by which he knew the parolee. Madenlian has set forth sufficient facts of pretext to raise a triable issue of fact.

Because Madenlian presented evidence of a prima facie case of unlawful retaliation, the trial court erred in granting summary adjudication of his retaliation cause of action. I concur in all other aspects of the majority opinion. Accordingly, I would reverse the summary judgment.

MOSK, J.

4